ROBERTS & CORLEY ET AL. V. MCFADDEN, WEISS & KYLE ET AL.

Decided March 31, 1903.

**1.—Contract for Sale of Land—Marketable Title.**

A contract for the sale of land binding the vendor only to execute and deliver a warranty deed requires him, under the law, to furnish a good and marketable title.

**2.—Same—Marketable Title Defined.**

A marketable title is one reasonably free from such doubts as would affect the market value of the estate; one that a prudent man, with knowledge of all the facts and their bearing, would be willing to accept.

**3.—Same—Measure of Damages for Breach.**

The measure of damages for breach of warranty in executed contracts for the sale of land is the purchase money paid and interest, without reference to the value of the land at the time of the breach or at any other time; and the same rule is usually applied in cases of breach of executory contracts to sell land.

**4.—Same—Rescission—Loss of Bargain.**

Where the title tendered is not good, or though good, is not marketable, the vendee is entitled to rescind the contract and recover back his advance payment, with interest, but he can recover for loss of his bargain only where the vendor has fraudulently or willfully refused to comply with the contract. See opinion for facts, including a failure to make known a prior oil lease of the land, then of record, held not to amount to fraud on the vendor's part such as would authorize recovery by the vendee for loss of bargain.

**5.—Same—Oil Lease Contract.**

An oil lease of land made in consideration of $1 (not in fact paid) and the lessee's promise to develop the premises and give the lessor ten per cent of the oil produced, stipulating that the lessee may terminate the lease at any time and that the sum paid shall be the lessor's full compensation, is a void contract because unilateral in character. Such void lease, adversely held, did not of itself render the title to the land an unmarketable one, and a sale of the land by the lessor prior to operations begun under the lease annulled the lease.

Appeal from the District Court of Jefferson. Tried below before Hon. J. D. Martin.

*F. J. & R. C. Duff,* for appellants.

*Greer, Greer & Nall, Crane, Greer & Wharton,* and *Proctors,* for appellees.

GILL, ASSOCIATE JUSTICE.—This action was brought on March 30, 1901, by Roberts & Corley, a partnership, and one H. L. Fagin against McFaddin, Weiss & Kyle, also a partnership, and one A. F. Lucas. Its purpose was, as against the defendant partnership, to enforce the specific performance of an executory contract to convey certain land to them, and, as against defendant Lucas, to cancel a certain oil lease which was averred to be void as to them, the plaintiffs.

Upon amended pleadings of both plaintiffs and defendants, as will hereinafter appear, the cause was tried to the court without a jury, and the trial resulted in a judgment for plaintiff against the defendant part-

nership for the amount of advance purchase money paid on the contract sued on, with interest up to the time of a tender which was adjudged to have been made. In all other respects, including costs, judgment was for defendants. From that judgment the plaintiffs have appealed, and under appropriate assignments of error insist it should be reversed.

On January 10, 1901, crude petroleum oil was discovered on a slight elevation of ground known as "Spindle Top Heights," situated on the John A. Veatch survey in Jefferson County, Texas. At that time W. P. H. McFaddin, V. Weiss and W. W. Kyle owned, among other lands in that survey, and out of that portion thereof known as the "Spindle Top Heights subdivision" of said survey, three subdivisions, or blocks of land, numbered 6, 19 and 20, aggregating, approximately, twenty-seven acres. Immediately prior to the discovery of petroleum on this survey of land the reasonable market value of these blocks was, approximately, $50 per acre.

On March 23, 1901, McFaddin, Weiss & Kyle, in consideration of the sum of $2000 cash, then and there paid by H. L. Fagin and Roberts & Corley, and for the further considerations mentioned in the agreement hereinafter recited, entered into the following contract:

"The State of Texas, County of Jefferson. For and in consideration of the sum of two thousand ($2000) dollars cash to us, W. P. H. McFaddin, V. Weiss and W. W. Kyle, in hand paid by H. L. Fagin and Roberts & Corley, a partnership firm composed of C. C. Roberts and Robert Corley, the receipt whereof is hereby acknowledged; and the further consideration of H. L. Fagin and Roberts & Corley agreeing to pay the further sum of fifteen thousand ($15,500) and five hundred dollars on or before the 10th day of April, 1901, we, the said McFaddin, Weiss & Kyle, bind ourselves to make good and sufficient warranty deeds to said H. L. Fagin and Roberts & Corley to the following tracts of land situated in Jefferson County, Texas, to wit:

"Parts of the J. A. Veatch survey, and of that portion thereof known as 'Spindle Top Heights,' and being blocks numbered six (6), nineteen (19) and twenty (20), containing twenty-seven acres, more or less; being part of the land bought by us of Guy W. Junker. But should said H. L. Fagin and Roberts & Corley fail to pay the balance of fifteen thousand five hundred dollars on or before April 10, 1901, then this obligation shall become null and void, and the said two thousand ($2000) dollars shall be forfeited to the said McFaddin, Weiss & Kyle, and shall be kept and held by them as their own property. Witness our hands in triplicate originals this March 23, 1901."

At the time that this contract was entered into the land, viz., blocks Nos. 6, 19 and 20, was leased for oil to A. F. Lucas, and the lease was of record in the public records of Jefferson County, but defectively acknowledged. The existence of this lease was known to McFaddin, Weiss & Kyle at date of said contract, but was unknown to the purchasers, Roberts & Corley and H. L. Fagin.

On March 26, 1901, the oil well, known as the "Beatty well," was suc-

cessfully brought in, and proved to be a well similar in character to the famous "Lucas well" theretofore completed.

On March 28, 1901, W. P. H. McFaddin, who throughout acted for himself and associates, approached plaintiffs, advised them of the existence of the oil lease, and offered to rescind the contract of sale and restore the amount paid in consideration of a release from all possible liability for damages by reason thereof. The plaintiffs declined the proposition. Upon an inspection of the records they found and examined the oil lease, which is hereinafter set out, and thereupon, on March 30, 1901, plaintiffs brought this suit, tendering the balance due.

On April 2, 1901, the defendants, McFaddin, Weiss & Kyle, served on the plaintiffs, Roberts & Corley and H. L. Fagin, the following notice:

"BEAUMONT, Texas, April 2, 1901.

"Messrs. Roberts & Corley and H. L. Fagin, City:

"Gentlemen.—Under the option contract between us made March 23, 1901, and covering blocks 6, 19 and 20 of Spindle Top Heights, to avoid litigation and as an overture of friendly settlement, I make you the following alternate proposition: First. I will return and pay you the $2000 cash you paid to me, releasing to myself, Weiss & Kyle, the tract of land described in the option contract, I, Weiss & Kyle releasing you against further payment, we mutually thereby rescinding and annulling the contract; or in the alternative, should you decline the above. Second. Upon your paying myself, Weiss & Kyle, the balance of the purchase price, $15,500, I, V. Weiss and W. W. Kyle will execute and deliver to you the general warranty deed (which will include the 1-10th royalty on the oil lease thereon), as called for in the contract.

"The first proposition must be accepted on or before April 10, 1901; otherwise, I, Weiss and Kyle will tender you the warranty deed and demand the $15,500 on April 10, 1901, and upon your failure to comply therewith, we shall forfeit the $2000 as stipulated in the contract. Respectfully

(Signed)     "W. H. P. McFADDIN."

In answer to this note the plaintiffs, Roberts & Corley and H. L. Fagin, delivered to the defendants the following reply:

"$15,500.     -                    BEAUMONT, Texas, April 2, 1901.

"To Messrs. W. P. H. McFaddin, V. Weiss and W. W. Kyle, Beaumont, Texas:

"Sirs.—We hereby and herewith beg to advise you that we are now ready and do hereby tender our readiness and willingness to complete the sale and purchase contracted between yourselves and the undersigned by contract dated March 23, 1901, and to that end we now demand of you a good and sufficient warranty deed to that same land which you contracted to convey to us, to wit, blocks six (6), nineteen (19), and twenty

32 Civil—4.

(20), Spindle Top Heights, subdivision of the John A. Veatch survey, in Jefferson County, Texas, which said good and sufficient general warranty deed must convey to us the unincumbered title to said lands, and be accompanied by a release of every valid prior outstanding conveyance of any right, title or interest in the fee or possession to or of said lands.

"You are advised that on the 28th day of March, A. D. 1901, we were advised for the first time, and have confirmed that advice by an inspection of the records, that there is a certain lease executed by Guy W. Junker to A. F. Lucas, dated September 6, 1900, copied into the deed records of Jefferson County, Texas, book 34, page 71, attempting to convey certain interests in the above premises. While this lease is as to us void, we being innocent purchasers for a valuable consideration, without notice, of said property, yet pending the adjudication of our rights with the said Lucas the rules of equity do not authorize us to pay the remaining sum of $15,500 contracted by us to be paid on said property, to you, unless you secure for us a release of said lease and contract dated as aforesaid, September 6, 1900, between Junker and Lucas. We have already tendered said sum of $15,500 into the District Court of Jefferson County, to be paid to you or such other person under the circumstances as the court may direct upon the trial of the suit filed by us, to which you and said Lucas are all made parties.

"But nevertheless we are now ready and prepared, and now tender you personally the said sum of $15,500, to be paid by us to you whenever you shall make, execute and deliver to us a good and sufficient warranty deed conveying us the unincumbered and unqualified fee simple title and possession of the aforesaid premises, which shall include and is hereby meant to include, title, not only to the mere soil and possession, but also to all minerals, mineral products, oils and gasses which are a part of the said lands. Upon your doing which we agree to dismiss the aforesaid case at our cost."

On April 10, 1901, the defendants, McFaddin, Weiss & Kyle, approached the plaintiffs and first tendered back to plaintiffs the sum of $2006.35 in cash, and offered to deliver same to plaintiffs upon the condition that plaintiffs release defendants from all claims for damages by virtue of the circumstances. This proposition plaintiffs declined. Defendants then tendered plaintiffs an instrument, the same being in form a general warranty deed, and offered to deliver the same conditioned upon the payment to them of the sum of $15,500. Plaintiffs stated to defendants that they had until midnight of that day to determine whether or not to accept this deed and the deed was left with plaintiffs for their examination. Plaintiffs then prepared another deed in all respects similar to the first, save and except that the habendum clause was made to read as follows:

"To have and to hold the above described premises, together with all and singular rights and appurtenances and hereditaments, including the mineral rights and rights of every nature whatsoever thereto in any wise

belonging, unto the said Roberts & Corley and H. L. Fagin, and their heirs and assigns forever."

Plaintiffs then approached defendants with both deeds, and advised defendants that they would not accept the deed tendered to plaintiffs by defendants, but would accept, and tendered to defendants for execution, the second deed, together with $15,500 cash. This deed defendants inspected and thereupon declined to execute.

On June 10, 1901, McFaddin, Weiss & Kyle filed their answer resisting the suit for specific performance and tendering back the sum of $2006.35, being the purchase money paid with interest to the date of their first offer of a warranty deed.

On July 9, 1901, the plaintiffs filed their first amended original petition, changing their suit to one for breach of contract and damages, alleging among other things that the land had so depreciated in value that it was worth less than the contract price, whereas at the date of the alleged breach it was worth about $500,000.

In December, 1901, defendants filed an amendment tendering specific performance, with prayer for judgment accordingly. This tender and prayer, however, was abandoned before trial, and the cause went to trial on March 31, 1902, purely as a suit on plaintiffs part for damages for breach of contract to convey land, and resisted by defendants, who tendered back the purchase money and interest. On April 21, 1902, the court rendered judgment as stated.

The record is very voluminous, and for the sake of brevity it will be necessary to make all statements therefrom as concise as possible consistent with clearness and accuracy. Hence we do not set out at length the findings of fact and conclusions of law filed by the trial court, deeming it sufficient to set out in the proper connection a brief statement of the court's finding upon any controverted issue we may find it necessary to discuss. The court determined every controverted issue in favor of defendants. In addition to the facts already stated as preceding, attending, or immediately succeeding the filing of the suit, we add that prior to the bringing in of the "Lucas well" the land in controversy could have been purchased for about $20 per acre. On September 6, 1900, defendants McFaddin, Weiss & Kyle bought this and other lands from one Junker and received a conveyance therefor without notice of the existence of the oil lease, which had been executed to Lucas on August 30, 1900. This lease was actually placed of record subsequent to the Junker sale to defendants, but prior to the date of the contract of sale. In making the contract to convey to plaintiffs McFaddin withheld his knowledge of the lease from plaitniffs and sent them to the records upon their own responsibility. It is a fair inference from the evidence that McFaddin at that time was anxious to make the sale, and feared knowledge of the lease on the part of the plaintiffs might prevent its consummation. He seems also to have had some fear that the lease was valid, and appears to have sought to avoid responsibility therefor. This is manifest by his offer, on April 2d, of a warranty deed subject to the provisions of the lease.

It is also plain that while the high prices of lands obtained, the vendors wished to cancel the trade and the vendees desired specific performance, and the variations in values seems to have been reflected by the changes in the pleadings of both parties. By April 10, 1901, there was, according to plaintiffs' contention, an enormous raise in values, due to the bringing in of the "Beatty well;" so much so as that plaintiffs placed their damages for loss of bargain at $482,000, and there is evidence tending to sustain the contention that the great rise in values occurred at that time. Whether the lease was regarded by the parties as valid or void, it was deemed a serious impediment to a sale of the lands, and the right to immediate sale was regarded as of the utmost importance, inasmuch as lands held at high prices because believed to be oil-bearing might, by the completion of a worthless well, be shown to be not oil-bearing, and fit only for ordinary uses. For these reasons the defendants had, May 1, 1901, procured of Lucas and his co-owners a release of the oil lease in controversy, agreeing to pay therefor practically half the value of the lands released. Of this fact plaintiffs did not learn until about the middle of June, 1901.

Broadly stated, the plaintiff's contention is that whether the title to the land in controversy was good, or wholly bad, or merely unmarketable, they are entitled to damages for the loss of their bargain. The minor propositions urged under the broad one just stated will be treated herein in their proper connection.

The defendants claim that no judgment other than that rendered could have been rendered on the facts because:

(1) Plaintiffs, in bringing suit for specific performance, exercised their right of election of remedies, and are finally bound thereby, and having thereafter refused an offer of specific performance, are in no event entitled to more than a rescission.

(2) That appellees performed their part of the contract in tendering a warranty deed within the contract period, and the breach was on the part of appellants who refused to accept it.

(3) The title tendered was good because defendants were innocent purchasers as to the lease, and because the lease itself was a nullity, being without consideration.

(4) Because even if the lease was valid, plaintiffs elected to take the property after knowing of the existence of the lease.

(5) Because, as there was on the part of appellees neither fraud nor willful refusal to convey, the measure of plaintiffs' rights was the return of the purchase money with interest.

In view of the disposition made of this appeal other propositions propounded by appellees as constituting defenses need not be stated.

In determining the questions necessary to be disposed of it is not our purpose to follow the brief of either party, but rather to discuss in the order of their importance the questions which seem to us to fix and determine the rights of the parties hereto. The briefs evidence much care and ability in their preparation, and we desire to acknowledge our

obligation to counsel for each party for the aid we have received therefrom and for the vast amount of labor saved to the court by reason of their care and research. We think, however, after a determination of the material facts which in the main are undisputed, it will be found that the rights of the parties are controlled by a few broad rules rendering it unnecessary to dispose in detail of the various assignments of error.

We find the following material facts presenting the issues of law upon which the appeal must turn:

1. The defendant partnership bought the land of Junker for value and without notice of the lease.

2. That the lessee paid no consideration for the lease and promised none, save an interest in the oil and gas product when discovered.

3. The lease is the only defect complained of; the title in other respects being both marketable and good.

4. Prior to the institution of the suit plaintiffs had full knowledge of the existence of the lease, and had considered its effect upon the title.

5. With this knowledge the suit for specific performance was brought and the demand maintained until June 10, 1902.

6. That on April 10, 1902, defendants tendered a general warranty deed conveying the property to plaintiffs, and the deed was declined.

7. That on June 10, 1902, they changed the suit to one for damages for loss of bargain, and so maintained it to the end.

8. That defendants were guilty of no actionable fraud, nor did they willfully refuse to perform their contract to convey.

What are the primary rights of the plaintiffs under the executory contract to convey the land in question? Clearly the right to a general warranty deed conveying a marketable title, upon tender of the balance of the purchase money within the contract period.

What were the rights of the vendors? Clearly to retain the $2000 advance payment as liquidated damages if the vendees failed to tender the balance within the time. But certain contingencies might excuse the vendees for failing to complete the bargain, and might justify them in demanding a rescission of the contract.

While the contract in terms only bound the vendors to execute and deliver a warranty deed, the law wrote therein that before the vendees could be required to accept it and complete their bargain, or could be made to forfeit anything for failure or refusal so to do, the title tendered must not only have been good, but marketable. Jones v. Phillips, 59 Texas, 609; Hurt v. McReynolds, 20 Texas, 599; Vardeman v. Lawson, 17 Texas, 16; Hollifield v. Landrum, 71 S. W. Rep., 979; Warvelle on Vendors, sec. 46.

By marketable title is meant one reasonably free from such doubts as would affect the market value of the estate; one which a prudent man, with knowledge of all the facts and their legal bearing, would be willing to accept. Hollifield v. Landrum, supra, and authorities therein cited; Warvelle on Vendors, secs. 299-351.

. When, therefore, McFaddin approached plaintiffs on March 28th, and stated to them that an oil lease existed upon the land, and that he could not procure a release thereof, it amounted to a statement that the title was bad, or at least unmarketable, and would have justified the plaintiffs in demanding a rescission and a return of their money, or else damages, which amounts, as will be hereafter seen, to the same thing. Maupin on Mar. Title, sec. 286.

But they might also demand the deed and rely upon the warranty and their power to remove the incumbrance, and the latter course after investigation, they decided to pursue. Their decision in this respect was evidenced by the form of the suit filed March 30, 1901, and by the written notice served upon defendants April 2, 1901.

Had plaintiffs accepted the warranty deed when tendered on April 10th, the right to object to the alleged incumbrance would have been waived, and objection thereto could have been only in case it was actually enforced. Of course such acceptance would not have been a waiver of any subsequent breach of the warranty. But knowing the state of the title, and accepting it with such knowledge, they would not be heard to complain of known defects until eviction resulted therefrom, or was shown to be threatening. Estell v. Cole, 67 Texas, 700.

It follows that in all matters which affected the mere marketableness of the title, as distinguished from matters affecting its actual validity, the acceptance of the deed would have been a waiver. It follows also that the defense that a title, though good, is not marketable (the defect being known) can not avail a vendee except in a suit by the vendor for specific performance or forfeiture of the penalty, or in a suit by the vendee to be discharged from performance or for rescission and to recover the advance payment. To recover for breach of warranty the title must be shown to be absolutely bad. Maupin on Mar. Title, sec. 286; Id., sec. 2; Brackenridge v. Claridge, 91 Texas, 527.

In this connection we may as well determine what, if any, are the further rights of the vendee in case the title tendered is not good, or, though good, is not marketable, and performance on his part is refused upon these grounds. We have already seen that for either of these reasons he may at least rescind and recover his advance payment and interest. But appellants contend that in such case the vendee may recover for the loss of his bargain, and have amended their suit upon that theory.

. For reasons which we will not pause to discuss at length the measure of damages for breach of warranty in executed contracts for sale of real estate has been fixed as the purchase money paid and interest, and this without reference to the value of the land at the time of the breach or at any other time. Hollingsworth v. Mexia, 14 Texas Civ. App., 363, and authorities cited.

The rule is not rested upon the theory of compensation, but is arbitrary, and proceeds upon the theory that in view of the infinite variety of matters which may affect the title to real estate, the vendor should

not be burdened with responsibility for the unknowable consequences which may proceed from his sale, but should be able to know in advance the measure of his liability. See Hollingsworth's case, supra, for authorities. The same rule is applied in most jurisdictions for breach of executory contracts to convey real estate, and if the rule in the one case is sound we can perceive no reason why it should not apply in the other, for manifestly the same reason exists for its application.

In a suit by a vendee of personalty the measure of damages for breach of contract to convey is the difference between the contract price and the market value of the property at the date of the breach. And the courts are by no means in accord in regard to the soundness of the reason for refusing to apply a like rule to sales of realty. But wherever the weight of reason lies, the weight of authority is plainly in favor of the rule as stated, unless the vendor fraudulently or willfully refuses to comply. Thus, if a person contracts to convey a piece of land on a certain day for a certain price, and between the date of the contract and the day of performance he sells to another, thus putting it out of his power to convey, he is liable to the vendee for the loss of his bargain. Whereas, if he had simply been mistaken in his ability to make title, the rule would be as first stated above.

We shall not enter into an extended discussion of the question or undertake to distinguish or reconcile the cases from our own courts. We content ourselves with a citation of the Texas cases in point and elementary authorities indicating the doctrine as announced by the weight of authority. The rule announced is clearly sustained by the English cases. 3 Sedgwick on Damages, secs. 1001-1006, and notes; Note to Kirkpatrick v. Downing, 17 Am. Rep., 687. The case last cited announces a different rule, but under the facts the English rule would have awarded a like measure of damages. Maupin on Mar. Titles, p. 212; Morgan v. Bell, 16 Law. Rep. Ann., 623; Sutherland on Damages, 130.

An examination of the Texas authorities shows that the English rule has been adopted in this State. Sutton v. Page, 4 Texas, 142; Durst v. Smith, 11 Texas, 282; Hall v. York, 16 Texas, 19; 22 Texas, 642; Wheeler v. Styles, 28 Texas, 240; Johnson v. Hamilton, 36 Texas, 270.

Phillips v. Herndon, 78 Texas, 378, states the rule as stated above, and applies it to facts in which willful refusal to convey was present. In it the case of Hopkins v. Lee, 6 Wheaton, 109, is cited, which announces generally the loss of bargain rule, but the case of Hall v. York and Sutton v. Page, though mentioned, are not overruled. It is believed that all the Texas cases in which recovery for loss of bargain has been allowed, either the element of fraud or willful refusal to convey was present, or else special damages were alleged. Mr. Sedgwick so construes the Texas authorities. Sedgwick, Damages, sec. 1009.

Whether, then, if entitled to recover at all, plaintiffs are entitled to be compensated for their loss of bargain, depends on whether defendants are shown to have either willfully or fraudulently refused to con-

vey. The trial court found, as stated, that defendants were guilty of no fraud, and the truth of this finding is assailed by appellants. They contend that the failure of McFaddin to disclose the existence of the lease was a fraud, and that his subsequent conduct in seeking to induce the plaintiffs to abandon the contract was a fraud upon plaintiffs, and that the tender of the deed with the limited warranty, the subsequent tender of a general warranty, and refusal to execute a deed specially warranting against the lease, was not an offer of compliance, but amounted to a willful refusal to convey.

Whatever may have been the motive of McFaddin in withholding from plaintiffs his knowledge of the lease, its legal effect must be measured by the rights of the parties at the time. By the contract the vendors promised only a warranty deed. No record title was promised. No abstract was promised. The vendees reserved the right to judge of the title for themselves. The court found, in effect, that McFaddin answered no question falsely in regard to the title, and the evidence is sufficient to sustain the finding. The lease was of record, and to the record the vendees were referred. His silence did not mislead them, for they had not taken his word for anything. Before the consummation of the sale and before the last day on which it might be consummated, he told them the truth about it, and offered to rescind the sale. Here again his motive is immaterial. He told them the truth, and the lease was found of record as he stated. He did not say the defendants would no longer be bound by their bargain. He stated only that he could not procure a release of the lease, and this also was true. The fact that McFaddin sought to use the existence of the lease as a means of inducing plaintiffs to rescind the contract and forego their right to specific performance, because the land had increased in value and he wished to withdraw from the trade, also falls short of legal fraud, because nothing false was stated, and because, even if the statements had been otherwise, they were neither acted on nor relied on by plaintiffs. As to the contention that the offer of a warranty deed subject to the lease amounted to a refusal to convey, we think the offer of April 10th, and when plaintiff was still demanding a transfer, was an offer of full compliance, unmodified and unrestricted by any former act. So, even if the restricted offer of April 2d amounted to a refusal to convey and might have fixed the rights of plaintiffs, they did not choose to so treat it, but continued their demand, and finally sued for specific performance. Whatever the parties may have thought of the deed of April 10th, tendered by defendants, whatever illusive hope the defendants may have had that under the facts their warranty did not bind them as against any danger from the lease, the fact remains that the deed so tendered bound them according to the full terms of the warranty, and their tender was within the letter of their promise and was made at a time when plaintiffs were still demanding the fulfillment of the promise, and could lawfully demand no more than a good and marketable title.

This brings us to the question of the validity of the lease. It is contended by appellees that the lease is void for two reasons: First. It was a unilateral contract, unsupported by any consideration, and was forfcited by Junker's conveyance to defendants before any prospecting was done thereunder. Second. Because they purchased of Junker for value without notice of the lease.

We are of opinion that either of these objections is fatal to the lease. It was shown without dispute that the consideration of one dollar named in the lease as paid was not in fact paid, and the only consideration upon which the contract rested, so far as the lessee was concerned, was the promise to develop the leased premises and to deliver to the lessor 10 per cent of the gross oil product. It may be held, when the question is presented in this State (it has been intimated in Oil Co. v. Teel, 67 S. W. Rep., 547), that the nominal consideration of one dollar, if paid, will support the option for the fixed time named in the lease. But here not only is it true that the cash consideration named was not in fact paid, but the contract was further weakened by the stipulation that the lessee could terminate the lease at any time, and that the sum paid the lessor should be his full compensation for any injury sustained. No sum was paid the lessor, and thus he is sought to be held at all events for the full time, the lessee being bound in no respect to do or perform anything. We can imagine no more glaring instance of a unilateral contract.

The lease being void, the vendors were under no legal obligation to expend money in an effort to remove it as a mere cloud affecting the marketableness of the title; hence the action of the court in excluding evidence of the ability of the vendors to discharge the lease was not error. The evidence adduced did not raise the issue of collusion between Lucas and the other defendants, nor would the proffered evidence on this point have served to present the issue. Its exclusion therefore was not error.

As finally determining the legal status of such a lease in this State we cite, National Oil and Pipe Line Co. v. Teel, 67 S. W. Rep., 545, 95 Texas, 586; Emery v. League, 6 Texas Ct. Rep., 719. We cite also in support of this view, Cowan v. Radford Iron Co., 3 S. E. Rep., 121; Knight v. Indiana Coal Co., 17 Am. Rep., 692; Eclipse Oil Co. v. South Penn. Oil Co., 34 S. E. Rep., 924. The cases cited establish the proposition that the lessor may annul such a contract at any time before performance begun, and the following cases announce the rule that a conveyance of the premises by the lessor prior to the beginning of operations by the lessee is an annullment of such lease. Eclipse Oil Co. case and Knight's case, supra; 18 Am. and Eng. Enc. of Law, p. 187; Coleman v. Applegarth, 11 Atl. Rep., 284; Trees v. Eclipse Oil Co., 34 S. E. Rep., 933.

It thus appears that the lease can not in any event be regarded as a valid incumbrance upon the land, and as this is the only objection urged by plaintiffs against the title, it must be regarded as good.

. It would serve no useful purpose to enter into a lengthy discussion of the subject of marketable titles. We have stated the general rule in a previous part of this opinion. While the lease in this case does not in all respects answer the requirements of the rule as to void incumbrances which nevertheless render the title unmarketable, yet we think under the peculiar circumstances of this case, and the conduct of the vendees themselves showing they regarded the existence of the lease a serious menace to the marketable value of the title, the vendees in an action by the vendors to enforce the contract of sale would be allowed to defend on the ground that the lease rendered the title unmarketable. But this can not affect the result, for, from what has already been said, the case stands thus: A deed to the property conforming by its terms and legal effect to the contract requirements was tendered within the contract period. The title thus tendered was good, the oil lease having been effectively annulled. Plaintiffs could lawfully refuse the deed alone upon the ground that the title was not marketable, and this at most would have entitled them to rescission, and to that effect was the decree of the court. If the title was bad there was neither fraud nor willful refusal to convey, so the measure of plaintiffs' damage was purchase money and interest, and that the court has decreed them.

In this view of the case it becomes unnecessary to notice the many other points made by the appellants, or those made in defense. The fact findings of the trial court are sustained in all respects, except on the issue of market value of the property and the purpose to resell, and we regard those findings as immaterial to any question necessary to be disposed of on this appeal.

Because we have found no reversible error in the record, the judgment of the trial court is in all things affirmed.

*Affirmed.*

Writ of error refused.