**PETROLEUM FINANCIAL CORPO-
RATION, Appellant,**

v.

**H. C. COCKBURN and Cockburn
Oil Corporation, Appellees.**

**No. 16192.**

United States Court of Appeals
Fifth Circuit.

Jan. 16, 1957.

Rehearing Denied Feb. 14, 1957.

Thaddeus G. Benton, New York City, Ben H. Schleider, Jr., Dillingham & Schleider, Houston, Tex., for appellant.

J. L. Webb, W. H. Colbert, Houston, Tex., for appellees.

Before CAMERON, JONES and BROWN, Circuit Judges.

## JOHN R. BROWN, Circuit Judge.

Petroleum Financial Corporation, the successor and beneficiary of a claimed contract made for it by its mastermind Benton, a lawyer—oil lease broker—promoter based in New York, appeals from the District Court denial of its claim of breach of contract by Cockburn (or his family corporation), a Texas oil operator and trader.

Putting cart before the horse, a brief outline of prior negotiations and surrounding circumstances is essential for an intelligent consideration of the question whether the writings declared on were, or are, a contract, and if so, whether standing alone, or upon attempted application of the terms, an ambiguity existed sufficient to allow resort to and use of this very parol evidence.

Benton, as a trader, or for like-minded clients, was interested in finding Texas oil deals for investment of New York venture capital which, in a world of high taxes, tax write-offs and the hopes of depletion allowance, was then readily attracted by the lure of wildcat operations. About October 1949 he met and had extensive discussions with Cockburn and some of his associates. At that time, and subsequently up to the parting of the ways in January 1950, Cockburn (or his agent Stone) submitted propositions on at least three areas, one of which— the Vance Structure, Edwards County, Texas—was the subject of the alleged contract involved here.

Not uncommon in these operations where the object is to bring together one who has, or can procure, acreage, (mineral leases) and the one, or many, who will supply the large risk capital required, the transaction is marked by great informality amongst a stratified succession of interested parties, each of whom cuts off a slice (e. g., overriding royalty, etc.) then sells all or a part of the rights to another.

So it was[1] with the Vance Structure. Cockburn neither owned nor claimed to own any mineral leases in the area. The leases were, to Benton's knowledge, owned by others, at least one of whom, Hunt Oil Company, was clearly identified in view of the preoccupation with the "Allison" well on the Hunt tract. Cockburn had, however, the substantial prospect of acquiring an interest since he had made a trade (apparently then oral only) with Swiger. Swiger, a geologist knowing of the area and the information reflected in the Allison well, previously plugged and abandoned by Hunt, had obtained[2] a

---

[1]. Statements concerning the facts in this opinion are but a paraphrase of the Trial Judge's excellent, detailed opinion. Clearly supported by ample evidence heard in a vigorous trial, they are binding upon us and pass easily the scrutiny of the "clearly erroneous" test, Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.; Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.

[2]. That extensive discussions and morally binding commitments were being made reflects the eternal optimism of the oil-promoter-trader, since Swiger did not get the first (Hunt) written farm-out letter until December 5, 1949 and those from Globe Oil and Refining Co. and Forest Oil Corporation were even later, December 27, 1949. Swiger's farm-out of the farm-out to Cockburn was not signed and transmitted to Cockburn until December 29, 1949, with acceptance by him January 4, 1950.

A "farm-out" is well described by Earl A. Brown, Assignment of Interests in Oil and Gas Leases, Farm-Out Agreements, etc., Fifth Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation (1954), page 25 at pages 69–70:

"A farm-out agreement is a contract to assign oil and gas lease rights in certain acreage upon the completion of drilling obligations and the performance of any other covenants and conditions therein contained. It is an executory contract. It is largely used in cases where the owner of a lease is unable or unwilling to drill on a lease which is nearing expiration, but is willing to assign an interest therein to another who will assume the drilling obligations and save the lease from expiring. Often the owner of the lease retains an overriding royalty or a carried interest as his consideration. * * *

farm-out, at least from Hunt, with some assurances that the other lessees would follow.

By identical language in each Farm-Out Letter to Swiger, the lessee agreed to "assign to you without warranty of title said oil, gas and mineral leases upon the following terms and conditions * * *." These were: on or before February 1, 1950, (a) commence reworking the Allison well by setting pipe and acidizing in a bona fide effort to make it a producer, or (b) commence operations for a new well within a specified area and a good faith prosecution of drilling to a specified depth. The lessees reserved a specified overriding royalty. Swiger's farm-out to Cockburn was in substantially similar form reserving a 1/16th override (from which he was to pay prior overrides) and, referring to the farm-outs from Hunt and the other lessees, provided: "I agree to assign to you on receipt of assignment from Hunt and Globe, et al * * * the oil and gas leases * * * indicated on the attached plat * * * on the following terms and conditions * * *."

Carrying it one step further, the Cockburn-Benton trade[3] was to be Cockburn's means of laying off part of the risk of the uncertain, but potentially high, cost of the work-over or drilling of the new well. And, of course, Benton contemplated the same process. For he, as had Cockburn before him, and Swiger

before Cockburn, on the *expectation* that when the work-over (or new well) operation was completed, he would get, by assignment, his ½ interest in the leases, in turn agreed to sell approximately ⅔rds of that interest to Bancroft Mitchell & Co. at a price of $25,000.00. The $25,-000.00 for the Cockburn phase was thus to come from Bancroft Mitchell & Co. leaving approximately 1,000 acres which Benton planned to sell, in whole or in part, to still others.

Indeed, it is this last step—planned sales to others—which Benton claims Cockburn's breach made impossible. This, he asserts, brought about his damage measured in terms of what he would have received in such sales.

In this process Benton had had extended discussions in Houston and this was followed by further conferences with agent Stone in New York City in early December 1949, at which time ownership and geophysical maps, geologist's reports and data were furnished by Stone. Benton was fully informed that Cockburn had the trade on a farm-out which required work-over operations on the Allison well (or commencement of a new well) on or before February 1, 1950.

It was in this setting that the telegrams were exchanged which Benton claimed became the sole contract.

■ The first, and principal one, was that of December 24, 1949.[4] The re-

---

"A farm-out is usually evidenced by an informal letter agreement, in which the owner of the acreage addresses his proposed assignee and outlines in his letter the conditions and provisions of the farm-out."

3. All discussions envisaged Benton acquiring a ½ undivided interest in the leases, the payment by Benton, divided between cost of leases and operational expense, was to be in the neighborhood of $25,000.00.

4. Its cryptic qualities were enhanced by transmission bereft of any punctuation. Benton insists that, as dispatched, it was punctuated as follows (punctuation absent in the Western Union original received by Cockburn is shown in [ ]):

"I CONFIRM PURCHASE FOR MYSELF [ , ] OR PETROLEUM FINANCIAL CORPORATION BEING FORMED [ , ] MERCHANTABLE TITLE TO ONE-HALF UNDIVIDED INTEREST USUAL SEVEN EIGHTHS OIL GAS LEASES SUBJECT OUTSTANDING ONE SIXTEENTH OF SEVEN EIGHTHS OVERRIDING ROYALTY [ , ] PRIMARY TERMS AT LEAST THREE REMAINING YEARS [ , ] YOU TO ABSORB ANY RENTALS DUE BEFORE MARCH ONE AND NO RENTAL EXCEEDING $1 PER ACRE [ , ] ON THREE THOUSAND ACRES APPROXIMATELY VANCE STRUCTURE EDWARDS COUNTY PER MAP SUBMITTED [ , ] FOR $2,000 [ , ] SUBJECT [ ; ]

ply [5] of December 26 was not an acceptance as it proposed a substantial variation in the size of the casing, 10 Tex. Jur., Contracts § 23; Antwine v. Reed, 145 Tex. 521, 199 S.W.2d 482; Garrett v. International Milling Co., Tex.Civ. App., 223 S.W.2d 67. Benton claims this was cured by his reply[6] of December 27.

Cockburn (through Stone) looked on this exchange as merely a confirmation of the general trade [7] which had been so long discussed. In one of the many contemporaneous long-distance telephone conferences between Stone and Benton then going on, the two agreed that January 3 would be the date for "closing." Then followed the letter [8] (December 31, 1949) from Benton to Cockburn which proved such a bombshell which was, the District Judge described it, the first intimation that the parties had

YOUR CLEANING HUNT WELL SECTION ONE COMMENCING MARCH FIRST OR SHORTLY THEREAFTER [ , ] RUNNING SEVEN INCH CASING TO AT LEAST 5,800' [ , ] PERFORATING CASING AND INTRODUCING ACID PER STONE'S WIRE TODAY AND COMPLETING INTO TANKS OR PLUGGING [ , ] DUE DILIGENCE AND IN WORKMANLIKE ORDER [ , ] MY SHARE COST THEREOF $23,000 [ , ] NO OTHER EXPENSE [ , ] COST OR RISK ANY KIND TO ME [ , ] YOU INSURE USUAL INSURANCE [ , ] I TO SHARE ANY SALVAGE FROM OPERATIONS [ , ] YOU TO ACCEPT $2,000 JANUARY 3RD AND FIRM COMMITMENT OF BANCROFT MITCHELL & CO ONE WALL ST NEW YORK TO PAY THE $23,000 ON OR BEFORE MARCH 1 [ , ] 1950 UPON DELIVERY ASSIGNMENTS TO US [ , ] YOU TO PROMPTLY DELIVER TITLE OPINION SHOWING GOOD MERCHANTABLE TITLE [ , ] COPIES LEASES AND ASSIGNMENTS TO YOU [ . ] YOU TO PAY F. Y. BENTON COMMISSION 5% UPON RECEIPT TOTAL PAYMENT [ . ] WIRE CONFIRMATION XMAS DAY SHORT HILLS [ . ] MERRY CHRISTMAS [ . ]"

5. "RECEIVED YOUR WIRE THIS DATE EDWARDS COUNTY PROPOSITION ACCEPTABLE WITH THE EXCEPTION OF SEVEN INCH CASING FIVE INCH WILL BE RUN WHICH IS ALL THAT IS NECESSARY LEE B. STONE"

6. "YOUR WIRE EDWARDS COUNTY DECEMBER 26 RECEIVED YESTERDAY. THANKS. AWAITING ENLARGED DETAILED MAP EDWARDS ACREAGE AND ALL PAPERS REQUIRED. * * *"

7. Cockburn, pointing to Benton's telegram of December 20, 1949, reading: "PLEASE RUSH TODAY, SIGNED AND ACKNOWLEDGED, BEST, COMPLETE CONTRACT EDWARDS COUNTY $5000 FOR ONE HALF INTEREST, $20,000 EARMARKED AS FLAT PRICE FOR ONE HALF SHARE ALL INTANGIBLE COSTS, PREPARING WELL FOR PRODUCTION, ETC. SHOW COMPLETELY UNDERTAKINGS BY COCKBURN. FORWARD LEASE, ASSIGNMENTS TO COCKBURN AND TITLE OPINION. TREAT SALVAGE. BUYERS NAME IN BLANK. INEFFECTIVE IF COMPLETELY EXECUTED COPY NOT DELIVERED AND FUNDS PAID OR ESCROWED BY DECEMBER 31. * * * REGARDS T G BENTON"
and which Stone immediately rejected:
"HOUSTON TEX 1949
DEC 21 PM 4 04
"IMPOSSIBLE ACCEPT PROPOSITION EDWARDS COUNTY ORIGINAL DEAL ONLY. * * *"
emphasized that the only trade was the one long discussed and, in any case, rejects summarily the idea that Cockburn had assignments of any leases.

8. "* * * Also, pursuant to my wire to you of December 24th, night letter, and your acceptance of December 26th, I send you herewith check of Bancroft Mitchell & Co., 1 Wall St., New York City, dated December 30th to your order for $2,000 drawn on the Roslyn National Bank & Trust Co. of Roslyn, Long Island, N. Y., with the suggestion that you put it through for collection, special, with the *understanding* from Mr. Lee Stone *that I shall have the title opinions and copies of leases and of assignments to you by airmail Tuesday, Jan. 3rd, and that all titles are good and merchantable.*

"It is my present intention to transfer to you the firm commitment of Bancroft Mitchell & Co. for the payment of $23,000 on or before March 1, 1950 upon the delivery to us of assignments of the one-half interest in the leases pursuant to agreement between us. * * *" (Emphasis supplied)

radically different ideas on what had been agreed to.

Benton's position, there spelled out, required the following action on January 3, 1950:

By Benton:

(a) Payment $2,000.00 cash.

(b) Surrender to Cockburn of Bancroft Mitchell's firm commitment to pay to Cockburn, on or before March 1, 1950, $23,000.00 in exchange for assignments from Cockburn

By Cockburn:

(a) Delivery of copies of assignments of leases *into* Cockburn

(b) Title opinion showing existing merchantable title in Cockburn as assignee of leases.

Cockburn's understanding coincided with Benton's as to Benton's January 3 obligations to (a) pay $2,000.00 cash, (b) surrender Bancroft Mitchell's firm[9] commitment. But Cockburn insists, no action was required by him on January 3. Performance required of Cockburn was completion of the work-over (or drilling of the new well) and when and as done (but not before) he would be entitled to the $23,000.00 upon delivery of a merchantable title to an undivided ½ interest in the leases. This was, of course, no trivial, formal difference since to Benton, Cockburn was warranting a present title subject to a defeasance while, as Cockburn saw it, he was agreeing only to transfer, in the future, a merchant-

able title as one of the conditions to Benton's payment of the $25,000.00.

Cockburn, immediately rejecting the Benton construction, throughout the ten days of negotiations[10] in Houston precipitated by it, continued his willingness to carry out the trade by which Benton would acquire an undivided ½ interest in the leases when and as the farm-out conditions were met. This ended by Benton, presumably as a prelude to litigation, peremptorily demanding evidence of assignments of merchantable title into Cockburn, and Bancroft Mitchell & Co. requesting the refund of the $2,000.00 check which Cockburn had deposited at Benton's urging. Cockburn, faced then with losing the whole farm-out or financing[11] it altogether, made a trade for a ¼ undivided interest with Johnson at a price which for a ½ interest would have netted $30,000.00.

On this issue which became so crucial to the parties, what did the assumed "contract" provide? At the outset of this inquiry, it is plain that there were no express provisions spelling it out. The opening phrase (telegram December 24, note 4, *supra*), agreeing to "purchase * * * merchantable title to" an undivided ½ interest taught only that such title had to be delivered on the day of final payment. All are in agreement that if found at all, it must be in these words:

"* * * YOU TO ACCEPT $2000 JANUARY 3RD AND FIRM COMMITMENT OF BANCROFT

---

9. A subsidiary question exists whether, as Cockburn claimed, this meant a cash deposit of $23,000.00 with a Houston escrow agent or, as Benton claims, a contractual undertaking by Bancroft Mitchell Co. to pay. Even if the latter, it is clear that Benton never tendered a firm commitment since Bancroft Mitchell's undertaking, at best, rested upon promises between it and Benton, not between Benton and Cockburn, and recognized that the parties could become released by January 15, 1950. It gave Cockburn nothing but a law suit in New York against New Yorkers. Additionally, there was never an unconditional tender of

Bancroft Mitchell & Co.'s "commitment," see note 8, supra.

10. During these negotiations the actual farm-out letters from the lessees and Swiger were seen by Benton.

11. Cockburn spent $85,000.00 on the work-over only to confirm that the Allison well was dry and unproductive. After that Cockburn did not want any of the leases assigned to him. Nor does Benton. Benton's claim, nicely built on the structure of a warranted present title, is for what he would have made had he sold, not retained.

MITCHELL AND CO ONE WALL ST NEW YORK TO PAY THE $23000 ON OR BEFORE MARCH 1 1950 UPON DELIVERY ASSIGNMENTS TO US YOU TO PROMPTLY DELIVER TITLE OPINION SHOWING GOOD MERCHANTABLE TITLE COPIES LEASES AND ASSIGNMENTS TO YOU * * *"

■ Starting with the impregnable premise that it is to be measured by what Cockburn received, not what Benton sent, the District Court concluded that some punctuation was indispensable to an intelligent divination of this Morseanic riddle and by a period,[12] he completely separated the words referring to actions on January 3 from those relating to assignments of leases. This made it clear that title in Cockburn and evidence of it, in the form of copies of assignments and title opinions, would not be required until Cockburn sought payment of the $23,000.00. Benton, shifting the period five words[13] so that the phrase " * * * you to promptly deliver title opinion" stands alone, contends that the obligation "to promptly deliver" could refer only to January 3 and if obliged to do this, it was, at least, an implied representation that Cockburn then had title to the leases. The significant thing, at this stage, is not the question: what interpretation is correct? It is, rather, the

fact that from the mere words themselves, either system of punctuation is equally permissible, and with or without it, the words equally permit the two contrary inferences. This is the classic case of ambiguity and full use[14] of the circumstances surrounding the dealings was proper to determine what, if anything, was really intended.

■ Once that is done, it leads to alternative conclusions either of which is fatal to Benton, that (1) the minds of the parties had not met, or, as the District Court with ample basis found, (2) the agreement never contemplated that Cockburn then had, or would evidence, present ownership in the leases. On the latter, the parol evidence convincingly demonstrates that Benton knew this was a farm-out subject to a 1/16 overriding royalty and a requirement for the reworking of the Allison well or the drilling of a new one. In that view, for Cockburn to have "assignments" as distinguished from the farm-out letter-contract binding Swiger to assign, would have given no one better assurances of ultimate performance and would have, conversely, unduly complicated a run-of-the-mill farm-out in the traditional loose form. This is so because, for each layer, any assignment would necessarily have to be either in conditional form or, if unconditional, deposited under escrow limitations for delivery when and as the

12. " * * * YOU TO ACCEPT $2000 JANUARY 3RD AND FIRM COMMITMENT OF BANCROFT MITCHELL AND CO ONE WALL ST NEW YORK TO PAY THE $23000 ON OR BEFORE MARCH 1 1950. UPON DELIVERY ASSIGNMENTS TO US, YOU TO PROMPTLY DELIVER TITLE OPINION SHOWING GOOD MERCHANTABLE TITLE, COPIES LEASES, AND ASSIGNMENTS TO YOU * * *."

13. " * * * YOU TO ACCEPT $2000 JANUARY 3RD AND FIRM COMMITMENT OF BANCROFT MITCHELL AND CO ONE WALL ST NEW YORK TO PAY THE $23000 ON OR BEFORE MARCH 1 1950 UPON DELIVERY ASSIGNMENTS TO US. YOU TO PROMPTLY DELIVER TITLE OPIN-

ION SHOWING GOOD MERCHANTABLE TITLE, COPIES LEASES, AND ASSIGNMENTS TO YOU * * *."

14. See Baker v. Nason, 5 Cir., 236 F.2d 483, 492; Navajo Production Corporation v. Panhandle Eastern Pipe Line Co., 5 Cir., 132 F.2d 1, 3; Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 157, " * * * a contract is ambiguous * * * when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. * * * In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous * * *."

**318**

drilling and payment conditions were met. In the meantime, Benton (and Bancroft Mitchell & Co.) had ample protection since the $23,000.00 would not be payable until assignments (with supporting title opinions) were executed and delivered. This would in turn have required the reworking of the old, or the drilling of the new, well. If, as Benton claims, he intended further to slice the petrolatum cake, he could have sold interest in his contract with Cockburn. For had there been assignments into Cockburn, all Benton could then sell (and all he was claiming to be able to sell) was the right to certain portions of assignments to be received by him from Cockburn in the *future* if and when extrinsic conditions were met. His plans did not call for the sale of interest in lands. He was peddling participations in a speculative venture which, if successful, looked to acquisition and transfer of such interest.

The reasonable construction of the contract was that, if Cockburn reworked the well or drilled a new one, he would be entitled to $23,000.00 from Benton (and Bancroft Mitchell & Co.) when and as he conveyed to them merchantable title to an undivided ½ interest.

 There was thus no breach by Cockburn in January 1950. But even if there were, we think the District Court further correct when he held that, under these circumstances, liability for failure of title was limited to the purchase price paid, which, in fact, had already been refunded. The sale of Johnson was an act to save the venture after Benton injected new conditions not previously discussed. And if, as Benton claims, the law were to read into the telegraphic exchange an obligation to have title on January 3, this would result from rigid application of the rule concerning parol evidence and would not turn Cockburn's actual lack of an existing title into the wilful, pur-

poseful bad faith conduct required by Texas law to subject the defaulting vendor to damages for the purchaser's loss of his bargain (i. e., profits he would have made). 43-A Tex.Jur., Vendor and Purchaser § 685; Garcia v. Yzaguirre, Tex.Com.App.1919, 213 S.W. 236; see Nelson v. Jenkins, Tex.Civ.App.1948, 214 S.W.2d 140, error refused; Roberts & Corley v. McFadden, Weiss & Kyle, 1903, 32 Tex.Civ.App. 47, 74 S.W. 105.

The judgment was right [15] and is Affirmed.

15. Since the result would be the same if the record were, as Benton requests, amended to include, though not offered in evidence below, his transmittal letter of December 29 enclosing, he says, a copy

of the telegram of December 24 with its original punctuation (shown by [ ] in note 4, supra), we need not determine whether the District Court's refusal was erroneous.