**NAVAJO PRODUCTION CORPORATION et al. v. PANHANDLE EASTERN PIPE LINE CO.**

No. 10224.

Circuit Court of Appeals, Fifth Circuit.

Dec. 8, 1942.

George I. Shannon, J. B. Dooley, and H. L. Adkins, all of Amarillo, Tex., R. H. Hanna, Fred E. Wilson, and William A. Brophy, all of Albuquerque, N. M., and Rex B. Goodcell, of Los Angeles, Cal., for appellants.

D. H. Culton, of Amarillo, Tex., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Navajo Production Corporation, and others, filed suit for declaratory judgment against Panhandle Eastern Pipe Line Company, and sought a declaration of the rights and legal relations of the parties under a certain contract and supplemental contract for the sale and purchase of natural gas from wells located on 1,847 acres of land in Carson County, Texas. The contract and supplemental agreement were entered into on August 4, 1930, by the seller, Horace G. Miller, Navajo's assignor, and the buyer, Texas-Interstate Pipe Line Company, which was succeeded by Panhandle Eastern Pipe Line Company. The case was tried without a jury, and the

court, after hearing much testimony and considering numerous exhibits introduced by the parties, made findings of fact and conclusions of law, found the issues in favor of the defendant, and entered judgment accordingly. Navajo and all other plaintiffs, except one, have appealed.

Decision turns upon the proper construction to be given to the contract and supplemental contract entered into by Miller and Texas-Interstate. The original contract recited that Texas-Interstate was engaged in constructing gas pipe lines "from the Panhandle of Texas, to markets in Missouri, Illinois, and Indiana"; and that Miller agreed to sell and Texas-Interstate agreed to purchase gas at the mouth of the wells "on a pro rata basis with other wells connected with Second Party's lines, located in the same field and producing from the same horizon or sand".

Paragraph (b) of the contract provided:

"It is agreed that as soon as said pipe line be completed and ready for use in the distribution of gas, and in any event not later than one year from the date of the delivery of this contract, second party will commence to take and market from the two wells located on the above described leased premises gas in quantities representing an equitable pro rata part of the gas to be distributed through said pipe line, taking into account the quantity of acreage covered by said lease and the production therefrom and the total quantity of acreage from which gas is being received and distributed through such pipe line and production of gas therefrom."

Paragraph (1) of the supplemental agreement provided:

"In connection with Subdivision (b) set forth on page 3 of said contract, second party has agreed and by these presents does agree that within twelve (12) months following the completion of the major part of second party's pipe line system and the first delivery of gas into said line, second party will accept delivery from the lease above referred to and described in said original contract in writing, a minimum of five million cubic feet of natural gas per day of 24 hours, averaged over six months periods which for the purpose of this agreement shall cover January to July and July to January of any year. It is also agreed in the same connection that as the volume of gas transported and distributed through the pipe line system now under construction and belonging to second par-

ty connecting the gas fields in the Texas Panhandle with cities to the north and east be increased, second party will accept delivery from the above described lease of additional gas in such quantity so that at all times the volume of gas delivered to second party from the above described lease will represent a fair and equitable portion of the total volume of gas to be delivered into said pipe line system from the leases with which said pipe line and lateral lines shall be connected, taking into account the area covered by the above described lease and the potential production of wells producing gas therefrom at any given time, as compared with the total area of leases with which said pipe line and lateral lines be then connected and the potential production from wells then connected with such pipe line system.

"In case of failure on the part of second party to take gas as above set forth, the contract of even date herewith mentioned in the first paragraph hereof may be cancelled and become void and of no effect by party of first part, upon giving ninety (90) days notice, in writing, of such default to party of second part. However in no event shall the contract be terminated before eighteen (18) months after the commencement of delivery of gas thereunder."

The supplemental agreement further provided that it was to be treated as a part of the contract, and that in construing said contract, "this supplemental agreement shall be treated as a part of the contract and shall be construed along with the other provisions of said contract in determining the rights of the parties hereunder."

Construing the contract of the parties as a whole the district court found that the contract obligated the defendant purchaser to take a minimum of five million cubic feet of gas per day, "only if such daily take * * * can be had on a pro rata basis with all other leases from which Defendant might at any given time also be taking gas." He found that the minimum requirement of five million cubic feet was placed in the contract to express the intention of the parties with respect to the seller's right to cancel the contract; and that under this provision "failure of Defendant to so take such minimum gives Plaintiffs the option to cancel the entire contract as its exclusive remedy." In addition to this finding based on construction of the contract "from the four corners", the court found

that the language of the instruments, construed in the light of the circumstances surrounding their execution, the clear intention of the contracting parties, and the practical interpretation and construction placed on the contract by these parties during the years following its execution, clearly demanded the construction he gave to it.

Appellants contend here, as they did below, that the provisions of Paragraph (1) of the supplemental agreement bound the pipe line company to take and pay for a minimum of five million cubic feet of gas per day from their wells; and that the remedy of cancellation afforded them in the event the purchaser failed to take the minimum amount, was not their exclusive remedy.

■■ In the construction of contracts the primary obligation of the court is to determine the intention of the contracting parties. If such intention can be gleaned clearly and plainly from unambiguous language in the contract, resort should not be had to other evidence. Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W. 2d 977. Where, however, the language is not plain and unambiguous and does not clearly reveal the intention of the parties, but is fairly susceptible of more than one meaning or construction, the court may properly consider the facts and circumstances surrounding the making of the contract, and the interpretation placed upon the contract by the parties who made it. Reed v. Merchants' Mut. Ins. Co., 95 U.S. 23, 24 L.Ed. 348; United States v. Bethlehem Steel Co., 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731; Ryan v. Kent, Tex.Com. App., 36 S.W.2d 1007; Hoffer Oil Corporation v. Hughes, Tex.Civ.App., 16 S.W.2d 901; Bowden v. Patterson, 51 Tex.Civ.App. 173, 111 S.W. 182.

■■ The contract and supplemental agreement of August 4, 1930, must be considered as the contract of the parties. Dunlap's Adm'r v. Wright, 11 Tex. 597, 62 Am.Dec. 506; Citizens National Bank v. Texas & Pacific R. Co., 136 Tex. 333, 150 S.W.2d 1003. Considering the contract and supplemental agreement as a whole, and not in separate fragments, we think its language justifies the construction contended for by the appellee and found by the trial court; that is, the buyer was required to take gas on a pro rata basis, but failure, in any event, to take five million cubic feet per day authorized the seller to cancel the contract and seek other markets upon the giving of ninety days written notice to the pipe line company.

The negotiations between Miller and the pipe line company prior to the execution of the contract clearly evidence the intention of the parties to include the minimum take requirement as a cancellation provision and not as an absolute obligation requiring the buyer to take or pay for such minimum· amount of gas. Miller drafted the supplemental agreement to embody such understanding. Moreover, after execution of the basic contract and supplemental agreement, Miller and the pipe line company did business under the contract, and through the years following, up until a few months prior to the filing of this suit, consistently and mutually recognized that the contract required a pro rata taking of gas, and that the minimum requirement for the daily taking of five million cubic feet of gas was a cancellation provision for the benefit of the seller, not a requirement that the buyer should receive and pay for such amount every day. These dealings through the years constitute strong indication of the true intention and understanding of the contracting parties.

The judgment is affirmed.