**E. L. BAKER and R. L. Price,**
**Appellants,**
**v.**
**Howard G. NASON et al.,**
**Appellees.**
**No. 15768.**

United States Court of Appeals
Fifth Circuit.
Aug. 27, 1956.

7.  The District Court's opinion is reported at D.C.E.D.Pa.1955, 136 F.Supp. 286, 290, under the caption Keating v. Mayer.

484

Jerome S. Hafter, Greenville, Miss., John C. Satterfield, K. Hayes Callicutt, Jackson, Miss., for appellants. Satterfield, Shell, Williams & Buford, Jackson, Miss., Wynn, Hafter, Lake & Tindall, Greenville, Miss., of counsel.

Richard W. Hogue, Jr., Hughes, Hubbard, Blair & Reed, New York City, Leslie Darden, New Albany, Miss., Thomas Fite Paine, William S. Turner, Aberdeen, Miss., Edmund L. Brunini, Vicksburg, Miss., for appellees. Charles McCamic, Wheeling, W. Va., John Westbrook Fager, New York City, Smallwood, Darden & Sumners, New Albany, Miss., of counsel.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

Appellants, E. L. Baker and R. L. Price, plaintiffs below, brought this action for an accounting and money judgment, recovery of title to mineral interests and for other relief against appellees, defendants below, Howard G. Nason, his wife, Mrs. Anice H. Nason, Charles McCamic, and Union Producing Company,[1] growing out of a contractual relationship entered into between plaintiffs and defendants in March, 1951, covering the ownership of oil and gas rights and the development thereof by drilling. At the conclusion of plaintiffs' case the Court below sustained a separate motion for a "directed verdict" filed by each of the defendants sued, upon the ground that the entire arrangement between plaintiff and defendants was nothing but a fraudulent scheme to cheat the landowners of Monroe County, Mississippi, out of their mineral rights.

This appeal, therefore, presents the primary question whether the evidence supports this ruling of the trial Court. If not, we are called upon to consider the entire case as made by plaintiffs to determine whether they were entitled to any relief thereunder and whether plaintiffs are barred from recovery by the several affirmative defenses relied on by the defendants. Since the ruling of the Court below was made upon motions for directed verdict, we must, for the purpose of this opinion, accept as true the credible evidence adduced by plaintiffs.

Plaintiffs offered evidence by which, if believed, the facts hereinafter set out may be considered as established. In March, 1951 defendants owned, under contract dated August 28, 1950 and subject to the conditions therein imposed, oil and gas leases delivered in escrow covering a block of 6,115 acres of land located near Muldon, Monroe County, Mississip-

1. Nason's partner in most of the important transactions by which the rights of the parties are determined was Malcolm N. McCaskill, who died before the action was begun and his estate was not sued. Since both Nason and McCaskill conducted the dealings about which the discussion will largely revolve, we will, for convenience, refer to the two of them as "the defendants" unless otherwise indicated. The other defendants will be mentioned specifically by name, and appellants will be referred to throughout as plaintiffs.

Union Producing Company was made a party only as stakeholder, and no judgment was entered below for or against it and no further discussion is necessary with respect to it.

pi.[2] Having theretofore failed to find a driller who would enter the project with them, defendants proceeded, by prior arrangement, on March 6, 1951 to Tyler, Texas, in an attempt to make a deal with plaintiffs, owners of drilling equipment and experienced in drilling oil and gas wells, to enter arrangements with them to clean out the Sanders well. Plaintiff Price and defendants spent a half day discussing the whole proposition and on the following day plaintiff Baker entered the discussions. All agreed that the Lenoir block was not adequate for such a venture and that it should be enlarged and rounded out by obtaining leases on about four thousand additional acres, and defendants were equipped and willing to do that.

While defendants' most pressing need was to obtain a letter from a drilling contractor showing that an agreement had been made to re-work the Sanders well, they were interested in assembling other blocks of acreage in the general vicinity of the Muldon block and procuring drilling operations to be conducted thereon. As the result of these discussions plaintiffs and defendants agreed to enter into a joint venture, pooling and combining the leases defendants already had and those they would obtain, with the drilling equipment and capabilities of plaintiffs and dividing both the expenses and the profits of the venture on an equal basis.[3] Plaintiffs advised defendants that they would have to follow their usual custom in such developments of obtaining assignments of their half interest in the leases so that they could pledge this interest to investors in order to obtain money for the Sanders operation and the other developments in contemplation, and defendants were agreeable to this.

At the end of the first day's discussion McCaskill set himself the task of drawing up a writing which he submitted to the others on March 7th. After making one change the contract was copied on the typewriter and all signed it.[4]

2. The leases had been given by the landowners to J. T. Sanders, Paine Lenoir and Thos. F. Paine, who, by the contract of August 28, 1950, had delivered them to the First National Bank of Aberdeen, Mississippi, as escrow agent to be delivered to defendants when they procured a well theretofore drilled, capped and abandoned on the premises of Sanders, to be cleaned out and brought in as a commercial producer. These leases will be referred to as the Lenoir block.

3. Except that plaintiffs were to bear the entire expense of re-working the Sanders well to the point of setting casing.

4. The contract minus signatures is as follows:

"Contract

"The State of Texas
County of Smith

"This Contract entered into this the 7th day of March, 1951, by and between Malcolm N. McCaskill and Howard G. Nason of Aberdeen (Monroe County) Mississippi, Parties of the First Part and Baker and Price Drilling Company of Tyler, Texas, Parties of the Second Part,
Witnesseth:

"Parties of the first part have acquired by lease contract oil and gas leases on certain lands in Township 15, South Range 6, East, Monroe County, Mississippi.

"Parties of the first part agree to secure oil and gas leases on land; to get new leases on the land where the leases have expired and to secure additional leases in Township Fifteen (15), Range 6 East, Monroe County, Mississippi.

"Parties of the Second part agree that after parties of the first part have secured the lease block, to the approximate amount of 10,000 acres more or less in the area of the J. T. Sanders No. 1 Well that was drilled by Carter Oil Company, that within 90 days after the lease block has been completed, Parties of the Second Part will place the proper rig and equipment on the J. T. Sanders well location, and to clean out and condition said well; testing formation or formations to the best of Oil Field practice; to save, take care of and produce the most profitable oil and gas section of oil or gas, if oil or gas exist in the subsurface formation or to the bottom of the hole.

"Parties of the First Part agree to divide the interest in the lease and the lease contract on an equal basis—one-half interest in the oil and/or gas that is saved and marketed out of the J. T. Sanders No. 1 Well.

"Parties of the First Part agree to se-

Pursuant to the discussions between the parties, plaintiffs also delivered a letter[5] which it was agreed defendants needed and would use in convincing the Lenoir group and other landowners that drilling operations would be begun after the Muldon block had been completed.

By the use of this letter defendants were able to obtain the additional leases to complete the Muldon block, which completion was accomplished about July 15th. By the use of the letter and contract of March 7th defendants were also enabled to procure a contract to be executed under which a lease from Sanders to Nason of the 960 acres on which the abandoned Sanders well was located, was delivered in escrow. This contract between Sanders and Nason was dated March 27, 1951 and referred to and was made coterminous in duration with the contract between plaintiffs and defendants dated March 7th, fn 4 supra; and it constituted in effect a working agreement or joint venture, between Nason and Sanders with respect to the defendants' interest in the Muldon block.

On the faith of the letter of March 7th defendants also assembled the further block known as the Rye block. The chief portion of this block was conveyed by contract dated May 15, 1951 between Rye and his associates and defendants, under which a large batch of leases were delivered in escrow to defendants upon condition of successful development. This contract gave defendants the express right to assign the leases conveyed by it. Defendants also obtained, April 18, 1951, an option to purchase mineral leases on

---

cure additional acreage on land in Monroe, Clay and Chickasaw Counties, and upon the execution of this Contract by parties of the Second Part, Parties of the First Part will assign to parties of the second part an equal interest and all expenses and money will be divided on a 50-50 basis on all future operations.

"The Parties of the First Part and Parties of the Second Part further agree to incorporate the contract entered into by and between Malcolm N. McCaskill, Howard G. Nason, T. J. Sanders, Paine Lenoir and Thomas Fife Paine dated the 28th day of August, 1950 as part of this contract.

"Both Parties agree to keep each other advised as to the progress; to deal fair and square with each other, and, in case, either party gets dissatisfied during the life of this contract, to meet and come to an understanding. If parties cannot agree, then all parties agree to arbitration.

"It is further understood and agreed that this contract is not a partnership deal in any way. We also agree that if this lease block is not completed within six (6) months from this date, then this contract will be cancelled and become null and void and of no effect. It is also agreed by all parties that if Baker and Price have not moved a rig on the location within six (6) months from this date, then this contract shall become null and void, cancelled and of no effect.

"When Baker and Price have tested any formation in this well and all four (4) parties involved agree to set pipe, from that date on the expenses will be prorated 50-50.

"Contract executed in quadruplicate with each copy to be considered an original for any and all purposes.

"Witness Our signatures this the 7th day of March, 1951."

5. "Baker & Price Drilling Company
"602 Fair Foundation Bldg.
"Tyler, Texas
"March 7, 1951
"Malcolm N. McCaskill and
Howard G. Nason
"McCaskill-Nason,
"Aberdeen, Miss.
"Dear Sir:

"We have this day entered into a contract with you to clean out and test the T. J. Sanders #1 well located in the Southwest corner of Section 22, Township 15, Range 6, East Monroe County, Mississippi.

"We have the proper rig and equipment and upon completion of the lease block in Township 15, Range 6 East Monroe County, Mississippi, we will move on to the location within 90 days to clean out and test the well, as per your lease contract.

"Hoping that you will have no trouble in getting this lease block into shape and that we can all be successful in our wildcat venture, we are

"Yours very truly,
"Baker and Price Drilling
Company,
"By R. L. Price
"Partner"

about four thousand acres of land and covering the interest therein owned by Federal Land Bank. Plaintiffs were never advised that defendants had obtained this option or assembled the Rye block, and certain writings executed by defendants in July indicated that plaintiffs were deliberately kept in ignorance of these facts.

In the meantime, plaintiffs and defendants discussed the cleaning out of the Sanders well on about a dozen occasions and some writings passed between them on the subject. Defendants were demanding that plaintiffs start work on the cleaning project, and plaintiffs were demanding that assignments be made to them of their interests in the assembled acreage according to what plaintiffs claim was the agreement between them as well as the universal custom in handling such transactions, so that they could procure advances of money thereon. Defendants took the position that such a division of the leases would be harmful to the whole operation and that they were not bound by the written contract to make the assignments until plaintiffs had finished the clean-out operation. This argument gave rise to an impasse which continued until September 11th, when plaintiffs and defendants signed a mutual release annulling the contract of March 7th and discharging all obligations arising therefrom. Plaintiffs testified that this release was obtained from them by fraud and was and is, therefore, void.

In the meantime, beginning in July, defendants had initiated discussions with others whom they attempted to interest in taking over the drilling obligations laid, by the agreement of March 7th, upon plaintiffs. Among these was one Briscoe, a promoter in West Virginia through whom the defendants made contact with defendant McCamic, who had extended negotiations with defendants, part of which were conducted on a trip he made to Mississippi. Resulting from those negotiations, the defendants and McCamic made arrangements under which McCamic put up in excess of $27,000 with which the Sanders well was cleaned out and was, early in November, brought into production as a commercial gas well thus opening an extensive and very valuable gas field. Plaintiffs knew nothing of the negotiations between defendants and McCamic.

November 29, 1951, the defendants, along with McCamic and Mrs. Nason, entered into a contract with defendant Union Producing Company for development of certain of the Muldon block of leases under which Union paid $200,000 for a half interest in these leases and in the Sanders well, and agreed to develop this acreage by appropriate drilling. In December plaintiff Price made a trip to Mississippi, learning of these developments, and had an extended discussion with defendant Nason in which he demanded that plaintiffs' rights under the agreement of March 7th be recognized, and that an immediate payment of $25,000 be made on account. Nothing definite resulted from these negotiations and plaintiffs thereupon immediately consulted a lawyer and shortly thereafter entered into a contract of employment with the lawyer, out of which employment this action arose. The foregoing is but a skeleton outline of the very involved facts appearing in the record. Further facts as developed by the evidence will be mentioned in connection with the several questions as they are discussed.

■ As stated, the judgment in favor of all of the defendants was entered by the Court below upon a finding entered by the Court of its own motion.[6] The

6. The pertinent portions of the Court's findings follow:

"The Court is of the opinion and so finds from the evidence in this case that the primary, if not the sole purpose of the contract between Baker and Price on the one hand and McCaskill and Nason on the other, which forms the basis of this lawsuit, was to provide McCaskill and Nason with a contract and letter to bring back to Monroe County and to exhibit to holders of liens [lands] here as an inducement to them to turn over such leases in escrow to McCaskill and

finding was made upon an issue not mentioned in the pleadings or raised by any of the parties. Plaintiffs contend that there is no basis in the record for this finding of the Court. The several defendants, while devoting most of the arguments to other points upon which they contend the judgment of the Court below was justified, make short arguments in an effort to sustain the finding of the Court. We do not find these arguments convincing and agree with plaintiffs that the findings of the Court are not sustained by the evidence.

The principle of law upon which the Court below manifestly acted was stated by the Supreme Court of the United States [7] in a case originating in Mississippi: "The complainant alleges, that the obligation to which he had voluntarily become a party was intentionally made in fraud of the law, and for this reason he prays to be relieved from its fulfillment. This prayer, too, is preferred to a court of conscience, to a court which touches nothing that is impure. The condign and appropriate answer to such a prayer from such a tribunal is this;—that, however unworthy may have been the conduct of your opponent, you are confessedly *in pari delicto*; you can-

not be admitted here to plead your own demerit; precisely, therefore, in the position in which you have placed yourself, in that position we must leave you." [8] But we cannot agree with the Court below that this record reflects such a situation. There is nothing in the actual testimony justifying the conclusion and we find nothing in the circumstances connected with the transactions to warrant the drawing of that inference.

The principle applied by the Court assumes that both parties were engaged in a fraud upon the public; that defendants requested the letter of March 7th for the purpose of using it to filch unsuspecting landowners of their mineral interests; that plaintiffs gave them the letter with the same purpose; and that defendants proceeded so to use it. Self-interest on the part of both parties negatives such a hypothesis.

The Lenoir contract of August 28, 1950 vested defendants with title to the leases involved only when and if a producing well had been developed from the abandoned well on the Sanders place; plaintiffs could acquire complete title to their portion of the leases only by accomplishing the same thing. No purpose could have been served by the joint ac-

---

Nason. That there was no real intent to seriously follow this matter up and to further perform the contract. That by the signing of the contract they held out to the landowners here in Monroe County that they were able to perform the contract and in good faith intended to do so. That Baker and Price were not financially able to carry out the contract as written, and knew it at the time of the signing that they were not.

"The Court is not certain and does not decide that these men knew the legal effect of such action, but the Court finds that this was a fraud and the mere setting up of a false front behind which deceit and deception was to be practiced, and in such a situation the Court will take no action to aid either party to the contract, but will leave them as it finds them * * *."

7. Creath's Administrator v. Sims, 1847, 5 How. 192, 46 U.S. 192, 204, 12 L.Ed. 111.

8. A more recent statement of the rule is found in 23 Am.Jur., Fraud and Deceit, § 183, p. 1004:

"As a general rule, if the parties to a fraud are *in pari delicto*, the law will leave them where it finds them. * * * Similarly, where the parties to a suit have been guilty of fraud in connection with the subject matter of the litigation and are *in pari delicto*, the court of equity, in the application of the principle of 'unclean hands', will leave them as it finds them, refusing its aid to either." And see also 19 Am.Jur., Equity, § 478, p. 330 et seq.; Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 814–815, 65 S.Ct. 993, 89 L.Ed. 1381; Whittington v. H. T. Cottam Co., 1930, 158 Miss. 847, 130 So. 745, 76 A.L.R. 332; and Woodson v. Hopkins, 1905, 85 Miss. 171, 37 So. 1000. And see 17 C.J.S., Contracts, § 281, p. 670, holding that the court will take notice of such a situation of its own motion.

**490**

tion of plaintiffs and defendants in hatching up and consummating such a fraud.

Moreover, it is clear from the proof that both parties made repeated efforts to get the situation into such a posture that the cleaning out of the well could be accomplished. Further, the tentative arrangements made by plaintiffs to finance the drilling by assigning their interest in the leases to the several witnesses who testified—which the Court seemed to believe were bona fides—is unexplainable upon the premise that plaintiffs never intended to do any drilling. And, without doubt, the defendants busied themselves with others, beginning almost immediately after that agreement with plaintiffs had been made, in an effort to procure the Sanders well to be developed. We do not find in the record or in the underlying logic of the situation any basis for the holding that plaintiffs and defendants were *in pari delicto* so that the Court would have no dealings with them in disposing of the issues raised by the pleadings; and we hold that the judgment sustaining the motions for directed verdict was not justified on the ground assigned by the Court below.

As stated, all of the defendants devoted most of their argument to an attempt to establish that the Court below reached the right result in sustaining their motions for directed verdict; and in urging that the judgment should be permitted to stand for the other reasons argued. Chief among these contentions is defendants' assertion that the written contract of March 7th was intended by the parties to be the sole repository of their agreements, that all negotiations were merged and integrated into it, and that the oral testimony received by the Court under reserved ruling was inadmissible.

■ We are unable to agree with this contention. The writing signed by the parties seems to have been the product of McCaskill's thinking, and there is nothing in the evidence indicating that the parties had formed the purpose of integrating all of their understandings in this one document. Cf. Green v. Booth, 1907, 91 Miss. 618, 44 So. 784, and Milton v. Burton, 1920, 79 Fla. 266, 84 So. 147, 150. Even if they did so intend, the document they signed failed to cover the whole situation agreed to by them; or, in the alternative, it covered what the parties were manifestly intending to arrive at in a very inexpert and ambiguous manner.

It must be kept in mind that the main point of difference which developed between plaintiffs and defendants and prevented the reworking of the Sanders well was the time at which the plaintiffs' interest in the leases, which were the subject of the contract, was to be transferred by the defendants to the plaintiffs. An examination of the writing of March 7th will show that this crucial point is either not covered at all, or is covered equivocally or ambiguously. The dealings between the parties, reflected to some extent in the writing, had to do with three sets of leases: those transferred to defendants by the Lenoir contract of August 28, 1950 concerning which the March 7th contract states, in the first paragraph, "Parties of the First Part have acquired by lease contract oil and gas leases * * *;" the additional leases to be obtained by defendants covering lands adjacent to the Lenoir block; and leases which defendants agreed to procure on "additional acreage on land in Monroe, Clay and Chickasaw Counties."

■ Without question plaintiffs were to be vested with legal title to their interest in each of those blocks. When? The fourth paragraph of the contract of March 7th provides: "Parties of the First Part agree to divide the interest in the lease and the lease contract on an equal basis—one half interest in the oil and/or gas that is saved and marketed out of the J. T. Sanders No. 1 well." Did the words, "the lease and the lease contract" refer, as the argument intimates, to the lease given by Sanders to Nason? That lease was not obtained until twenty days after the contract of March 7th was executed and is nowhere

mentioned in the writing. It is more logical to assume that the quoted provisions in the written contract down through the words "on an equal basis," had reference to the Lenoir contract with defendants. If so, the time the assignment of that interest was to be made is not stated in the written contract.

The only other mention of time in relation to the assignment of mineral interests to plaintiffs is in the fifth paragraph of the contract of March 7th: "And upon the execution of this contract by parties of the second part, parties of the first part will assign to parties of the second part an equal interest * * *." Defendants claim that this time provision has application solely to the additional acreage they agreed to assemble in Monroe, Clay and Chickasaw Counties. If so, the provision is meaningless because those leases had not yet been secured and could not be assigned unless the word "execution" is given the very strained construction of meaning performance instead of the normal meaning of signing and delivering.[9]

Moreover, the writing lays upon plaintiffs the duty to do nothing but clean out the Sanders well unless the concluding words of the fifth paragraph require plaintiffs to drill a reasonable number of wells: " * * * and all expenses and money will be divided on a fifty-fifty basis on all future operations." It is not possible to decipher from the language of this writing the intent of the parties with respect to the important matter of the several operations manifestly contemplated in it.

Another important feature not clearly covered in the writing of March 7th is the time limitation applying to plaintiffs' obligation to move a drilling rig onto the Sanders well and complete the cleaning out operation. The third paragraph requires plaintiffs to act "within 90 days after the lease block has been completed" by defendants "to the approximate amount of 10,000 acres . * * *."

Proof dehors the writing showed that leases bringing the total near that figure had been secured by July 15th. Under this time limitation, plaintiffs could have moved the rig to location at any time before October 12th.

But defendants notified plaintiffs that they were in default for not beginning these drilling operations by September 7th. They based this action on the provisions of the eighth paragraph of the March 7th writing providing " * * * that if Baker and Price have not moved a rig on the location within six months from this date, then this contract shall become null and void * * *." It is argued by plaintiffs with some force that this limitation is joined to one rendering the contract void if defendants failed to complete the lease block within six months and is operative only in event of such failure.

These conflicts, omissions and ambiguities make it clear that a court is bound to look beyond the terms of that writing to ascertain what the intent of the parties was. The Supreme Court of Mississippi has laid down a comprehensive and dependable guide for ascertaining what the parties had contracted to do when the writing does not fully and clearly define their intent. Sumter Lumber Co., Inc. v. Skipper, 1938, 183 Miss. 595, 184 So. 296, 298, suggestion of error overruled 183 Miss. 595, 184 So. 835: "When the language of the deed or contract is clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court looks solely to the language used in the instrument itself, and will give effect to each and all its parts as written. When, however, the language falls short of the qualities above mentioned and resort must be had to extrinsic aid, the court will look to the subject matter embraced therein, to the particular situation of the parties who made the instrument, and to the general situation touching the subject matter, that is to say, to all

9. Cf. Allen v. Boykin, 1946, 199 Miss. 417, 24 So.2d 748, and Holmes Bros. v. McCall, 1917, 114 Miss. 57, 74 So. 786.

the conditions surrounding the parties at the time of the execution of the instrument, and to what, as may be fairly assumed, they had in contemplation in respect to all such said surrounding conditions, giving weight also to the future developments thereinabout which were reasonably to be anticipated or expected by them * * *."

And what that Court said in Magnolia Textiles v. Gillis, 1949, 206 Miss. 797, 41 So.2d 6, 9, is applicable:

"They * * * demonstrated by their own disagreement and divergence of understanding of its [i. e. the written contract's] significance, made manifest that the phrase is ambiguous * * *. This situation justified the resort to the further aid of construction, that of the negotiations and conversations leading up to the adoption of the restrictive covenant."

And this Court, in Navajo Production Corp. v. Panhandle, etc., Co., 5 Cir., 1942, 132 F.2d 1, 3, approved the action of the trial court in receiving evidence of negotiations between the parties because it found that "the language is not plain and unambiguous and does not clearly reveal the intention of the parties, but is fairly susceptible of more than one meaning or construction * * *." [10]

■ There is credible testimony that plaintiffs, while actively engaged in the drilling business, were largely forced to follow the course, quite prevalent in the oil industry, of finding investors who would, by accepting assignments of lease interests, join them in the hazardous pursuit of oil and gas and that this was fully explained to defendants. Moreover, the testimony seems to show without serious contradiction that there was a general custom prevailing in the oil industry that assignments of lease interests would be obtained by drillers and peddled out to the oil fraternity to obtain money for wildcat drilling. General customs are accepted as furnishing omitted terms of contracts between parties engaged in the same or similar vocations.[11]

We are not impressed with defendants' argument that they had nothing to assign. When the March 7th contract was made they had a contract with Lenoir et al. transferring a large body of acreage to them by delivery of the leases in escrow. They could assign those leases subject to the escrow agreement and that is all plaintiffs requested them to do. Further, defendants obtained other leases in their own names, including the Rye block, which they were at liberty to assign to plaintiffs, both under the law and under the express terms of their contract of May 15 with Ralph Rye et al. And defendants recognized the assignability of their lease interests in their negotiations and actions with McCamic.

■ The record contains a large volume of evidence tending to establish that, in their conversations of March 6th and 7th, plaintiffs and defendants entered into an agreement in the nature of a joint venture. The Supreme Court of Mississippi has shown a liberal tendency towards such arrangements, especially in the oil and gas industry in which informality seems to be the rule in dealings between participants in it. See Sample v. Romine, 1942, 193 Miss. 706, 8 So.2d 257, and McCartney v. McKendrick, Miss. 1956, 85 So.2d 164.

■ Whether the proof offered by appellants be considered as establishing such a joint venture, or supplying terms not dealt with in the written contract, or furnishing an approved aid in construing that ambiguous instrument does not

10. To the same effect see Hessig-Ellis Drug Co. v. Parks, 1928, 150 Miss. 322, 116 So. 435; Tallahatchie Compress & Storage Co. v. Hartshorn, 1921, 125 Miss. 662, 88 So. 278; Green v. Booth, supra; 17 C.J.S., Contracts, § 322, p. 750 and 17 C.J.S., Contracts, § 381, p. 875.

11. Cf. Edward E. Morgan Co. v. United States for Use and Benefit of Pelphrey, 5 Cir., 1956, 230 F.2d 896. And see also Bliven v. New England Screw Co., 23 How. 420, 64 U.S. 420, 431, 16 L.Ed. 510; 55 Am.Jur., Usages and Customs, § 27, pp. 287-8 and 2 Williston on Contracts, § 652-4.

make much difference. The testimony is in the record and, if believed, makes out a case in favor of plaintiffs and should be submitted to the trier of the facts for decision on this, the most crucial point in the case.

■ Defendants insist that plaintiffs are barred from recovery by failing to assert their claim of fraud with sufficient promptness, by laches and by estoppel. Plaintiffs insist that they set in motion the machinery for establishing their claim as soon as they were advised what the situation was, and employed counsel within a few weeks. These defenses asserted by defendants are affirmative defenses and call for a full hearing of the testimony of both sides. McCartney v. McKendrick, supra.

Finally, defendants claim that the release executed by plaintiffs on September 11, 1951, standing alone, bars their right to recover. Plaintiffs claim, on the other hand, that this document was obtained from them by fraud and false representations which they offered evidence to sustain. The oral testimony is buttressed by proof that defendants did not "tote fair" with plaintiffs. For instance, the contract of March 7th provided: "Both parties agree to keep each other advised as to the progress; to deal fair and square with each other, and, in case either party gets dissatisfied during the life of this contract, to meet and come to an understanding."

But it is disclosed in the evidence that defendants had, in April and May, obtained muniments of title to several thousand acres of land as, in the contract, they had obligated themselves to do. They did not advise plaintiffs of this although plaintiffs were, during the period, engaged in drilling two wells at nearby points. They admitted in a letter to Briscoe, quoted elsewhere herein, that they were purposely withholding this information from plaintiffs. The contract with Rye et al. of May 15th indicated on its face that defendants were then pursuing the intent and purpose of seeking others besides plaintiffs to develop the leases covered by it although that acreage was embraced within their contract of March 7th with plaintiffs. Moreover, defendants were dealing actively with McCamic and others several weeks before the release was taken; and defendants not only failed to advise plaintiffs of this, but their conversations with plaintiffs carried the clear implication that they intended to carry out their agreement with plaintiffs and contained no hint that they were all the while conducting negotiations with others the effect of which would be to oust plaintiffs. The fact is that, when the release of September 11th was sought and obtained, defendants' deal with McCamic—more favorable to them than their deal with plaintiffs—was moving towards the latter stages of consummation.

■ It is established largely by documentary evidence that, beginning less than thirty days after the dealings of March 6–7 between the parties, defendants were engaging in activities admittedly covered by the written contract and concerning which they kept plaintiffs in ignorance. Such conduct was condemned both by the writing of March 7th and by the relationship which plaintiffs claimed to have been established by their oral dealings.

■ Under either theory a fiduciary relationship existed between plaintiffs and defendants which imposed upon all parties the obligation to deal in utmost good faith. The situation revealed in this record bears close resemblance to the facts involved in McCartney v. McKendrick, supra, and that case, decided since the judgment was rendered below, furnishes an accurate blueprint for decision here.

And we dealt with one phase of the facts involved in the McKendrick case and recognized the doctrine of joint venture as established in the Mississippi case of Sample v. Romine, supra, giving broad effect to informal verbal agreements between members of the oil fraternity, in Lyle Cashion Co. v. McKendrick, 5 Cir., 1953, 204 F.2d 609, affirming the decision

of the District Court for the Eastern District of Louisiana, New Orleans Division, 97 F.Supp. 1008.

■ Of course, defendants counter all this with the assertion that they were unable to induce plaintiffs to perform their part of the agreement and that they were, therefore, justified in turning elsewhere to obtain that performance. All of these issues involved questions of fact to be decided by the Court after hearing the evidence of both sides. It is clear that the evidence of plaintiffs would, if believed, entitle them to some recovery unless evidence were offered to rebut it.

■ Even if the evidence should be found insufficient to set aside the release, plaintiffs would still be entitled to have the Court consider, after hearing all of the evidence, whether they could recover their claimed proportion of what defendants got out of the McCamic deal. Plaintiffs testified that defendant Nason so stated to them over the telephone as an inducement to their signing the release, and the letter dispatched with the release and signed by both Nason and McCaskill tends to corroborate this oral testimony.[12]

Defendant, Mrs. Anice H. Nason claims that no case at all was made against her by plaintiffs. She did not testify before the Court below and only fragmentary excerpts from her deposition appear in the record; and her connection with the case is, therefore, revealed only by a meager showing.

It appears that she was in charge of the office for defendants Nason and McCaskill and wrote all of the letters and documents emanating therefrom. Nason and McCaskill assigned to her, November 14, 1951, their rights in an option to purchase from the Federal Land Bank of New Orleans its mineral interest in approximately 1,714 acres of land, the consideration being recited as one dollar and other good and valuable considerations. There were thereafter conveyances between her and her husband, Howard Nason, of mineral interests within the ambit of the agreement of March 7th. Consideration for the conveyances made to her, aggregating more than fourteen thousand dollars, seems to have been put up by Howard G. Nason. She evinced a general knowledge of the dealings between the parties including those with Briscoe and McCamic, and evidently she knew of the written contract and letter of March 7th. She did not file a separate answer claiming lack of notice; but answered jointly with her husband, indicating her joint participation with him in some of the activities involved.[13]

■ It is true that the Court below stated that the case would be decided in favor of Mrs. Nason independent of the finding of mutual fraud upon which the judgment rested. But the Court did not make any detailed findings of fact upon which its conclusion was based and, further, the Court had announced at the outset that it desired to hear argument only on the main question upon which the decision was grounded. In another

12. "McCaskill —— Nason
"Aberdeen, Mississippi
"Sept. 8, 1951

"Dear Price & Baker ——
"Inclose please find papers, as per Howards conversation over the phone. If you will sign the origionial & one copy & send them back to us. We will keep on trying to skin this cat. And if we can live long enough, I think may be we can.

"And if we do, we are all friends, and both of us here hope to continue. And Howard joins me in saying that if we can put this over there is enough up

here for a lot of us to make all the money all of us will ever need. So keep us posted as to your whereabouts & we will do the same.
"Wishing both of you the Best of Luck
"Always, We are
"Your Friend,
"Mack.
"Howard"

13. E. g. The answer states, "These defendants [that is, the Nasons, husband and wife] say that on August 29, 1952 these defendants for the first time talked to Charles McCamic." [Intended doubtless for Aug. 29, 1951.]

trial the issue of Mrs. Nason's liability can be more fully developed and specific findings entered with respect thereto.

Defendant Charles McCamic had separate counsel and made a separate defense and the Court below indicated after stating, "There will be a decree for the defendants," that it felt that McCamic would be absolutely protected by the release. What we have said above concerning Mrs. Nason, the absence of argument or findings, applies here. The showing against McCamic is not a strong one, but we feel there was enough to require that his motion for a directed verdict be overruled. The evidence of knowledge on his part is partly circumstantial, but it is enough to require explanation. Some of the evidence against him is derived from a written memorandum he made after he had spent several days in Mississippi beginning August 28th. Among the statements made in that memorandum were these:

That Roy Briscoe mentioned the matter to him sometime prior to July 15th.[14] It is not logical that Briscoe failed to advise McCamic of the facts contained in this letter. The memorandum further stated that McCaskill called him on the 'phone, mentioning the "understanding with an unnamed party whereby the party was to come in and clean out the present existing well;" and that McCaskill "said to me his intentions were *not to permit this party to clean out the well as they had not played fair with him.*"

McCamic's memorandum further stated that he and defendants talked about the "possibility, probability and necessity to transfer some of the leases *we had* on the best plan to be obtained. The three of us agreed to this;" and, further, "Sanders has executed a lease to *our group* and *we stand in his shoes.*" [Emphasis supplied in each instance.] McCamic, an experienced lawyer, examined the status of the Sanders well and all other details involved with meticulous care and it is not logical that he failed to understand the various contentions of the parties concerning the contract between plaintiffs and defendants which Nason stated that he thought he had shown McCamic.

It may be that McCamic can take the stand and explain these admissions and circumstances which, unexplained, tend to indicate that he had a general knowledge and understanding of the whole situation including that between plaintiffs and defendants. We think that the record showing is such as to require that he do this and that the Court proceed to find the facts after hearing all of the evidence.

This record discloses a complicated case and it contains many exhibits and much testimony which would logically be used in another trial. The Court and the parties can decide which portions may thus be utilized. The case made on behalf of plaintiffs requires, in our opinion, a full hearing of all of the facts all of the parties may be able to place before the Court. We express no opinion as to the weight of the evidence or the manner in which conflicts should be resolved. Our discussion of the evidence relates alone to our conclusion that issues of fact are present; and in general to their relation, as revealed by this *ex parte* showing, to the rules of law which should be considered in resolving them.

The judgment of the Court below is reversed and the cause remanded for

---

14. McCaskill had written Briscoe July 15th advising that defendants had entered into contract with Baker-Price Drilling Company to test the Sanders well, but instead the company had drilled two wells in Washington County, Miss., and expressing the idea that "they are either broke or they want to stick us for more or something." They told Briscoe to get "the attorney friend of yours" to hop a plane and come on down, stating, "If your man wants to go in with us we can place him." The letter stated also that defendants were going to drill a well in the Rye area, "and we haven't mentioned that we have the area under lease to them."

July 15th was the date when the Muldon block was completed by defendants, setting in motion the ninety days plaintiffs were given to begin cleaning the Sanders well.

further proceedings consistent with this opinion.

Reversed and remanded.

HUTCHESON, Chief Judge.

I concur in the result and particularly with what is said in the last two paragraphs of the opinion.