LOCKWOOD v. OHIO RIVER R. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. July 9, 1900.)

No. 302.

1. CONTRACT TO CONVEY RIGHT OF WAY TO RAILROAD—CONSTRUCTION.

An agreement in writing by a landowner, in consideration of the advantages to accrue to him from the construction of a projected railroad, and of certain covenants on the part of the grantee, granted and conveyed to the railway company "the full and free right of way, of the width of fifty feet," through his land, on a line previously surveyed, and contained covenants for the execution of a deed, when required by the company, conveying the land in fee simple. The agreement was signed by the grantor alone, was acknowledged by him, and filed for record by the company, and not until after 16 years, when it became apparent that the land was valuable for oil and gas, was any request made for a deed. *Held*, that a right of way only was intended to be conveyed, and that the railroad company took only an easement in the land.

2. SAME.

The agreement having been prepared by the railway company, any doubt as to its true meaning should be solved adversely to the company, and not construed most favorably to the grantee under the general rule.

3. SAME—DEPENDENT COVENANTS—EFFECT.

The covenant to execute and acknowledge a deed to the railway company conveying the land in fee simple being a dependent covenant, and the estate or interest conveyed by the agreement being limited to an incorporeal hereditament, the operation of said covenant is necessarily restricted by the granting clause, and cannot require the conveyance of a greater estate.

Appeal from the Circuit Court of the United States for the District of West Virginia.

A charter was issued by the state of West Virginia on April 18, 1881, to the Wheeling, Parkersburg & Charleston Railway Company, for the purpose of constructing and operating a railroad from the city of Wheeling to a point at or near the city of Charleston, in the same state: the name of this company being afterwards changed, by proper proceedings, to the Ohio River Railroad Company. On April 10, 1882, the following agreement was entered into:

"This agreement, made and entered into this 10th day of April, 1882, by and between Jesse Pugh, of the county of ———, West Virginia, of the first part, and the Wheeling, Parkersburg & Charleston Railway Company, a corporation under the laws of West Virginia, of the second part, witnesseth that, whereas, the said railroad company proposes to construct and build a road through the said county of Wood: Now, in consideration of the advantages which said road will be to the said party of the first part and to his property, and of the premises, and for the further consideration, that the said railroad company agree to make and build a good roadway or crossing where the private road of said Pugh crosses said railroad, and also to put in or build cattle stops wherever said railroad crosses from one field to another; and, if said railroad company shall destroy any fruit trees during the construction of said road, shall pay for the same at the rate of ten dollars ($10) for each tree so destroyed, the said Jesse Pugh does hereby grant and convey unto the said Wheeling, Parkersburg & Charleston Railway Company the full and free right

of way, of the width of fifty feet, with necessary ground for cuts and fills for the road for the said company, in and upon and through the lands of the said Pugh, on which he now resides, described substantially as follows, to wit: Being the line as surveyed by Engineer Wharton. But it is understood and made a part of this agreement that the said railroad company, in constructing said road, shall either build the said roadbed far enough from the gravel bank along and below which the same runs, to keep the same from washing, or, in lieu thereof, shall protect the same with a wall, it being understood that the said gravel bank shall be undisturbed,—which right of way is hereby granted and conveyed for construction, building, and use of the road of the said company; and the said Pugh hereby releases to the said company all damages which may in any way be sustained by reason of the construction or building of said company's road through the said land, or on account of the temporary use or occupancy of or damage to the land of the said Pugh by the said company, its agents or servants, during the construction of the said railway; and the said Pugh does hereby covenant and agree to execute and acknowledge in due form of law, when required by said company, a deed conveying to said company, in fee simple, the said land hereinbefore described. Witness the following signatures and seals.                                Jesse Pugh. [Seal.]

"State of West Virginia, Wood County, to wit.

"I, Patrick V. Dolan, notary public of said county, do certify that Jesse Pugh, whose name is signed to the writing above, bearing date on the 13th day of April, 1882, this day acknowledged the same before me in my said county. Given under my hand this 2nd day of April, 1883.
                    "Patrick V. Dolan, Notary Public.

"It having been found necessary, in the construction of the railroad and in the protecting of the gravel banks spoken of, to destroy twelve fruit trees, the said Jesse Pugh consents to the same; and said railroad company have paid said Pugh the sum of ninety dollars, the receipt of which is hereby acknowledged, payment in full for said trees.                      · Jesse Pugh.

"State of West Virginia.

"Wood County Court Clerk's Office, January 5, 1884.

"The foregoing writing, bearing date April 13, 1882, with annexed certificate and receipt, was this day recorded in said office.
                            "Th. G. Smith, C. W. C. C."

On March 5, 1888, Jesse Pugh and Hannah A., his wife, in consideration of the sum of $705, conveyed the entire tract of land, upon part of which the railroad was constructed, to Arias N. Pugh and Drucilla C. Pugh, his wife, who on the same day executed a deed of trust to H. C. Henderson to secure the payment of the purchase money, which deed of trust contained, also, certain covenants, which have no bearing on this controversy. After this date Jesse Pugh died, and A. N. Pugh and his wife, being then the owners in fee simple of the tract of land, entered into an agreement, May 31, 1898, with Stephen Lockwood, whereby the said tract of land was leased to Lockwood for the purpose of searching for and producing oil, gas, and other minerals. Under this agreement Lockwood went upon the lands so leased to him, bored for and discovered large deposits of petroleum oil and gas, and commenced producing the same. The wells drilled by Lockwood were adjacent to the right of way of the defendant railroad company. The Ohio River Railroad Company entered into an agreement with Samuel Logan, August 18, 1898, whereby it granted to Logan all the oil and gas in and under the real estate included within this right of way, lessor to receive one-eighth part or share of all the oil produced, and $50 per annum for each and every gas well drilled, on the premises therein described; and it being expressly stipulated in said agreement that "the lessor does not warrant the title to the said premises in any respect whatever, but the said lessee drills and operates thereon entirely at his own expense and risk." Logan entered into possession of the premises under this agreement, and drilled wells upon the right of way, conducting the oil produced through the pipes belonging to the Eureka Pipe Company. Jesse Pugh, during his lifetime, and A. N. Pugh, since his death, paid taxes on the

whole tract of land; and in 1898 the railroad company demanded of A. N. Pugh a conveyance in fee simple of the right of way above described, which was refused. In November, 1898, Stephen Lockwood filed his bill of complaint in the circuit court of the United States for the district of West Virginia against the Ohio River Railroad Company and Samuel Logan, setting forth the above facts, claiming that the railroad company acquired only an easement on said land, and as such had no right to the oil and gas and other minerals lying thereunder; that it was a corporation whose powers were limited to the building and operating of a railroad, and that it had no right to engage in any other business, and its contract with Logan was ultra vires; and that the well bored, being 15 feet from the eastern line of the complainant's land, would drain the oil from his land,—and praying an injunction and the appointment of a receiver. The court below denied the application for the order of injunction, and refused to appoint a receiver as prayed for, being of opinion that the defendant company acquired an absolute title to the lands under the agreement of April, 1882, and from this decree the appellant has appealed.

James S. McCluer (J. G. McCluer, on the brief), for appellant.

H. P. Camden, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge, after stating the facts as above, delivered the opinion of the court.

This appeal requires us to give interpretation to the instrument of April 10, 1882, which in terms "grants and conveys to the railway company the full and free right of way, of the width of 50 feet, with necessary grounds for cuts and fills for the road of said company in, upon and through the lands of Pugh," upon the line surveyed by the engineer of the company, "which right of way is hereby granted and conveyed for the construction, building, and use of the road of the said company." If it had ended here, there could be no doubt that it was intended to convey simply the right of way, an easement, and not the land itself. The doubt has arisen out of the concluding words, which are as follows:

"And the said Pugh does also hereby covenant and agree to execute and acknowledge in due form of law, when required by said company, a deed conveying to said company in fee simple the land hereinbefore described."

In a clause added at the foot, it is provided that the sum of $90 should be accepted in full payment for certain trees destroyed upon the right of way. No deed was demanded until shortly before the commencement of these proceedings, and none was ever actually executed. The court below held that it was immaterial whether the deed was called for or not; that the defendants, having taken and held actual possession of the land for over 10 years without interference, had acquired an absolute title to the same; and the appeal impeaches the correctness of that conclusion.

The first rule of exposition, which governs every other, is that contracts should be so interpreted as to give effect to the intention of the parties; and while the words selected by the parties themselves as a symbol to denote their purpose are usually the primary source from which intention is drawn, and the best and surest guide to its discovery, yet being employed sometimes by designing persons to disguise rather than to express the true thought, and being liable to care-

less misuse or ignorant misapplication, it is always the duty of the court, in all cases where they are susceptible of different constructions, to take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted, for the purpose of ascertaining the true intent; for the intention of the parties is manifestly paramount to the manner chosen to effect it. The courts therefore may avail themselves of the same light which the parties enjoyed when the contract was executed, and may place themselves in the same situation as the parties who made it, in order that they may view the circumstances as those parties viewed them, and so judge of the meaning of the words and the correct application of the language to the things described; and if any of the terms used seem to contradict the manifest intention, as clearly indicated by the agreement as a whole, the intention must govern. Now, we can have no doubt that the intention of the railway company at the time this instrument was executed was simply to take a right of way, and that the intention of the grantor was simply to give a right of way; for that is all that was actually granted and conveyed in terms by the instrument itself, neither party then knowing that there was a mine of undiscovered wealth lying beneath the right of way. No money consideration was paid to the grantor, the consideration mentioned being the advantage which the road would be to him and to his property. The mere right of way upon which the railway company constructed its road, and the building of the road through his land, fulfill all of the requirements which can be assumed to have been in contemplation of the parties at that time. It is not to be presumed that the railway company desired at that time any more than the right of way or easement. If it had desired an absolute conveyance of the land, nothing would have been simpler than to have taken a conveyance thereof, if the grantor had then been willing to convey it. That the railway company desired nothing more is clear from the fact that it asked nothing more, and for more than 16 years that seemed to suffice. "Contemporanea expositio est optima et fortissima in lege." The familiar rule that where the terms of description are uncertain it shall be construed most favorably to the grantee, inasmuch as it is assumed that the fault is in the grantor, and he shall not take advantage of the difficulty which he himself has created, can have no application here, as against the grantor, because it is manifest that this agreement was prepared by the railway company, it having been brought to our attention in a case cited that words identical with those employed in the concluding covenant in this agreement were used in procuring other rights of way by the same company about the same time; and, if there is doubt as to the true meaning of this covenant, it should be solved adversely to the railway company. It would not be fair to assume that, under the guise of procuring simply a right of way, the railway company intended by the use of these words to take a conveyance in fee simple. The words of the covenant, if separated from the rest of the agreement, are very broad, but they ought not to be taken in their broadest import if they are equally appropriate in the sense limited to the object the parties had in view and their apparent intentions as deduced from the whole instrument; for,

while the maxim is, the grant of the principal carries the incident, the converse of the proposition is not true. General expressions are controlled by special provisions, and the sweeping clause will be limited to the estate and things of the same nature and description as those previously mentioned; and the exposition should be upon the whole contract, and not upon disjointed parts taken separately, in order that you may collect from the whole one uniform and consistent sense, if that may be done. The granting clause of this instrument conveys only a right of way, which is a mere easement, the owner of the soil retaining his exclusive right in all mines, timber, and earth for every purpose not incompatible with the use for which it is granted; and although hereditability cannot strictly be predicable of property held by corporations, which can have no heirs, the rights of way of railroad companies are defined to be incorporeal hereditaments, and such easements, though imposed upon corporeal property, give no right to the property itself. This instrument, although called an "agreement," is signed only by Jesse Pugh, and in its essential elements it is nothing more than a deed of conveyance to the railway company of the right of way therein described. As such it was put upon record by the grantee, and its road constructed upon the right of way so granted. The consideration of the deed was the advantage to accrue to the grantor from the construction of the road, and the interest conveyed was the full and free right of way, of the width of 50 feet. The right to the soil remained in the grantor, and such right was recognized by the grantee in its subsequent payment for the trees destroyed. The consideration was the advantage expected from the construction of the road across the grantor's land. The grant of the surface enabled the grantee to fulfill this consideration. That carried with it the right to use so much of the earth and other material as was necessary to the construction and maintenance of the railroad, and such right of way, with the incidents thereto, was all that was needed to enable the grantee to perform his agreement, which was the construction of the road upon the surface of the land, and for anything more there was no consideration paid or promised. Here we have every element necessary to a deed of a right of way,—consideration, granting and habendum clauses. The description of the thing granted is "the full and free right of way, of the width of fifty feet, * * * described substantially as follows, to wit: Being the line as surveyed by Engineer Wharton." Then, presumably for the purpose of providing for a formal deed after the road was actually located, when the thing granted could be described particularly and not "substantially," there follows the covenant in the words above cited. For more than 16 years no demand was made for the fulfillment of the covenant. The reason is obvious. The instrument called an "agreement," being in substance a deed or conveyance of the right of way, was treated as such. It was put upon record, and the railway company entered under it, and has remained in undisputed possession ever since, and no formal deed was considered necessary; the company having received all that it bargained for, and all that it paid any consideration for. Whether it be considered a covenant for further assurance (that is, a means of enforcing a specific performance of the

grantor's agreement to make a good title), or as a covenant of warranty, it is a dependent covenant; and it is elementary that, however broad and comprehensive the covenants in a conveyance may be, they are to be construed as securing to the grantee only the estate actually limited to him by the conveyance. Their office being merely to assure and defend that which has been granted, they are only co-extensive with the grant, and can have no wider scope and effect than the conveyance to which they are annexed. "In construing and applying covenants, they are intended not to enlarge, but to defend the grantee of the estate granted in the deed, so that, if the grant be of less than a fee, a covenant to warrant it to the grantee and his heirs does not enlarge the estate to a fee." 3 Washb. Real Prop. 448. And courts will limit the operation of the general covenant, however absolute it may be in form, so as to effect the true intention, if it is plainly to be inferred that the covenantor did not intend to use the words in the general sense which they import. There is no room for doubt as to the true intention expressed in the body of the instrument,—that in apt words it conveys only a right of way (that is, an easement),— but the contention is that by the use of the words "fee simple" the grantor bound himself to convey the land itself when so required by the railway company. "A fee simple may be had in incorporeal as well as corporeal hereditaments." 1 Washb. Real Prop. p. 82. "Where the granting clause of a deed declares the purpose of the grant to be a right of way for a railroad, the deed passes an easement only, and not a fee, though it be in the usual form of a full warranty deed." Jones, Easem. p. 212. The estate or interest conveyed being limited to an incorporeal hereditament, the operation of this covenant is necessarily restricted, and cannot require the conveyance of a greater estate, and the grantee can only demand under it a conveyance in fee simple of such incorporeal hereditament. Covenants do not of themselves pass any estate, or enlarge or restrict the estate conveyed.

In Sweet v. Brown, 12 Metc. (Mass.) 176, there was an action for alleged breach of covenant; the defendant having conveyed "all my rights, title, and interest in and to" certain real estate, with covenants that he was lawfully seised in fee of said premises, that they were free of all incumbrance, that he had good right to sell and convey the same, and that he would warrant and defend the same against all persons. The court says:

"The covenants are in terms general, but in the construction of a deed we are to look at the whole deed, and the covenants are to be construed so as to give effect to the intention of the parties, so far as it can be done consistently with the rules of law. The warranty is of the premises which were granted and conveyed by the deed. But that was 'all my right, title, and interest in and to that parcel of real estate situate,' etc. It was not a grant of certain land in general terms, but of his title and interest in such land, and this particularly and fully expressed. The warranty must be taken in a limited sense. It must be restricted to his title and interest. The covenant here attaches to the estate and interest conveyed, and is not a general covenant of warranty of the whole parcel particularly described by metes and bounds. Such construction will reconcile all parts of the deed and give effect to each."

The case of Moore v. McGrath, 1 Cowp. 9, is cited in Allen v. Holton, 20 Pick. 458, to sustain the proposition that every deed is to be construed according to the intention of the parties as manifested by the

entire instrument, although it may not comport with the language of a particular part of it, and shows to what extent a court may go in qualifying and even in rejecting a particular clause in a deed in order to effectuate the intention of the parties. There the lands were minutely described in the premises, and then followed a sweeping clause purporting to convey "all other the donor's land," etc. The court held that nothing passed by this sweeping clause, and that it was probable that the drawer omitted by mistake some words in the sweeping clause. "All the subsequent covenants have reference to the grant, and are qualified and limited by it."

There is no reasonable ground to doubt that the court would have ordered this deed to be reformed at the instance of the grantor, Pugh, if he had made it clearly to appear that it was his intention to grant only a right of way, and that he was misled by the grantee as to the effect of this form of expression, if it was intended to be claimed that by the use of the words "fee simple" he covenanted to convey an absolute estate in the lands, when he was led to believe that its effect was only to carry out the agreement made by him, which was to convey an easement simply. "Courts will reform deeds where by mistake the words are made to convey other estate than the parties intended, even though the mistake consists in the legal effect of the words used, while the words themselves were such as the scrivener intended to make use of." 3 Washb. Real Prop. 381.

We are of opinion that it was the intention of the grantor to convey only a "right of way" and that the words chosen to effectuate that intention have a well-known and universally accepted legal meaning, and describe the tenure, not the land granted; that the railway company therefore took only an easement in the land, and not the land itself; that the covenant is not to be construed so as to enlarge the grant; and that the railway company is not entitled by virtue thereof to anything more than a formal deed in fee simple of an incorporeal hereditament. It follows that the decree of the circuit court is reversed, and the case remanded for further proceedings in conformity with this opinion.