U. S. INDUSTRIES, INC., Appellant,

v.

CAMCO, INCORPORATED, Appellee.

No. 17671.

United States Court of Appeals
Fifth Circuit.

April 8, 1960.

Rehearing Denied May 21, 1960.

James T. Wright, James B. Simms, Houston, Tex., Thomas E. Scofield, Kansas City, Mo., W. E. Dyche, Jr., Browning, Simms, Hyer & Eickenroht, Dyche, Wheat & Thornton, Houston, Tex., for appellant.

W. Brown Morton, Jr., New York City, Tom Arnold, Houston, Tex., Robert McKay, New York City, for appellee, Dean S. Edmonds, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, of counsel.

Before CAMERON, JONES and BROWN, Circuit Judges.

### JOHN R. BROWN, Circuit Judge.

We deal once again with the gas lift art whose importance in the field of oil operations is reflected by the volume of recent patent litigation.[1] As before, we run into familiar names of common adversaries and here treat for at least the third time with the very King patent 487,[2] whose validity[3] was upheld in Bryan v. Garrett Oil Tools, Inc., 5 Cir., 1957, 245 F.2d 365, and U. S. Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198. While the case with this beginning still has many of the earmarks of the full blown patent validity-infringement trial into which it expanded, it is now really something quite different. Despite the obviously thorough pretrial preparation, an extended record comprehending countless exhibits prepared with care and much expense effectively to demonstrate what skilled experts discussed in terms close to the ultimate decision facing the Judge, this is not now a patent case. It is but another diversity case construing a Texas contract (license) made in Texas and generally performed (or breached) there.

Following the format of Luckett v. Del Park, Inc., 1926, 270 U.S. 496, 46 S.Ct. 397, 70 L.Ed. 703, U. S. Industries, Inc., owner of the King patent 487, brought this suit against Camco, the licensee, for patent infringement for acts outside the scope of the license[4] granted. Camco denied any of its acts were outside the license (and hence it had not infringed the King patent) and alleged the affirmative defenses of laches and equitable estoppel. In addition, it asserted two counterclaims. In the First Counterclaim, based on diversity jurisdiction, 28 U.S.C.A. § 1332(a), Camco sought a declaratory judgment that under the applicable (Texas) law, its actions were within the license. In the Second, jurisdiction being based on the patent laws, Camco sought a declaratory judgment that the King patent was invalid and not infringed. After a lengthy trial, the Court held that Camco's action was within the license contract. This resulted in a judgment which (a) dismissed USI's complaint for infringement, (b) sustained Camco's First Counterclaim declaring its conduct within the scope of the license and (c) dismissed Camco's Second Counterclaim challenging validity of the King patent.[5]

---

1. See, e. g., U. S. Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1960, 277 F.2d 282; Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191; U. S. Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198; Guiberson Corp. v. Equipment Engineers, Inc., 5 Cir., 1958, 252 F.2d 431; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 1957, 245 F.2d 365; Guiberson Corp. v. Garrett Oil Tools, Inc., 5 Cir., 1953, 205 F.2d 660, 662, footnote 3; Price-Trawick, Inc. v. Gas Lift Corp., 5 Cir., 1939, 101 F.2d 134.

2. King 2,339,487 issued January 18, 1944.

3. Claims 1, 2, 3, 5, 6, 7, 11 and 13 have thus far been challenged and sustained in these two cases.

4. In the License Agreement of June 4, 1947, Olsco Manufacturing Company and Henry U. Garrett, as licensors, granted to Camco and two individuals a license under King patent 487. U. S. Industries,

Inc., the plaintiff below, is the successor to the licensors' title to the King patent. Camco is the only licensee named a party to this suit.

5. Camco's ready formal acceptance of USI's statement in its opening brief that "The questions of infringement and validity of the King patent are not involved in this appeal" has precipitated a further controversy. The trial court by extensive formal findings of fact and conclusions of law decided all of the issues pertinent to the case based upon contract as well as the traditional validity-infringement patent suit presented by the Second Counterclaim in USI's reply. The Court, in construing the permission granted by the license, also determined that certain devices were within the claims which were valid and infringed, but for the license. By reason of this and the legal effect of the denial of relief sought by Camco's Second Counterclaim, USI contends that the Court has sustained validity by a

While the problem is one of construction of a contract—a patent license, for which the usual principles of contract law control, Storm v. United States, 5 Cir., 1957, 243 F.2d 708, 710, 711; 69 C.J.S. Patents § 249—the patent is of interest. For the patent and the 1947 controversy over it was the precipitating subject of the contract. Lest some small kernel be picked up and then by the tender, imaginative nurture of counsel be germinated into a full flower of truth as an authoritative construction and interpretation by us of King 487, we emphasize that our description of the patent, the novelty of its solutions, the meaning or limitation of its several claims has no such purpose. Our capsulated summary, with all of the attending inaccuracies, is merely to give some understanding to the text and context of this contract and the nature of the present controversy of whether particular devices are within the scope of the license grant.

The King 487 patent covers essentially two things in the gas lift field. First, it is a *system* by which there is installed in an oil well a series of control valves set to open at successively lower pressures from top to bottom and gas is introduced into the annulus between tubing and casing in predetermined volumes (amounts) *and* pressures.[6] This permits automatic gas lift operations with increased efficiency. This result is without regard to whether the control valves are spring, pneumatic, hydraulic or weight loaded. Second, it relates to *valves*, as such.[7] The distinctive novelty in this crowded old area was that the valves had a bellows charged and sealed with gas (or elastic pressure fluid). As to be expected, the two broad categories are further refined. Concerning the *system*, one group of claims (10, 11, 13) prescribe (a) the kind of valve, i. e., bellows charged and sealed, and (b) that the declining difference in pressure settings, top to bottom, be accomplished by differences in the sealed pressure-charge of the bellows.[8] The other system claims involved here[9] do not prescribe the type of valve or the manner by which pressure differences are to be achieved.[10]

As to the *valves*, the claims are subdivided into two groups. The first, and undoubtedly the most important for us even though they are admittedly exclud-

final judgment dismissing the Second Counterclaim from which Camco could have, but has not appealed. Camco insists that by virtue of the license provision expressly recognizing validity, the question could have been open for determination only if it were found that Camco's acts were outside of the scope of the license. Once this was determined adversely to USI, validity was not open to question, and the dismissal of the Second Counterclaim was a compulsory procedural result unrelated to the intrinsic merits of validity. This matter has no bearing upon the issues for our decision, and we expressly disavow any purpose to intimate our conclusions, one way or the other, upon it.

6. The system claims are 1, 2, 5, 6, 7, 10, 11, 13.

7. The valve claims are 3, 4, 8, 9 and 12.

8. Claims 10, 11 and 13 prescribe the valve as "a sealed bellows * * * and an elastic pressure fluid within the bellows under a pressure" [Claim 10], "a hermetically sealed member * * * and an elastic pressure fluid within each"

member [Claim 11], and "a pressure sealed bellows unit * * * each of said bellows being sealed at a different pressure * * *" [Claim 13]. As to the declining pressure differences, top to bottom, the claims provided "the pressure in the various bellows varying progressively" [Claim 10], "the pressures of said [elastic pressure] fluid in the [bellows] * * varying progressively" [Claim 11] and "each of said bellows being sealed at a different pressure" [Claim 13].

9. Two of these claims, Nos. 1 and 2, are admittedly licensed and not charged to be infringed.

10. Claims 5, 6 and 7 merely describe the valves as "a series of unloading valves [on the tubing] set to open at successively * * *" lower pressures top to bottom. These claims are principally concerned with the timer, intermitter, volume, control and pressure regulator as the "means to introduce a predetermined amount of pressure fluid into" the casing and then into the tubing after opening the desired control valve or valves.

ed from the license and not charged to be infringed, comprises claims 3 and 12. These claims define a valve structure in which means are provided to furnish a seal protecting the bellows from pressure after the bellows has moved a certain predetermined distance.[11] The second group of valves, claims 4, 8, 9, called for a dampener baffle as a means of preventing a too violent opening the moment the valve comes off its seat as the gas pressure introduced into the annulus overcomes the sealed pressure of the bellows valve.[12]

In like fashion to give understanding to the present controversy, it is helpful briefly to consider the assertions of USI. The contention of USI is twofold. First, the license to Camco did not cover valves, as such, at all. Second, the grant was limited to the King system and then only to the extent of the particular specified valves identified as "Exhibit B" in the contract. It then translates this into the specific charges that (1) as to valves, some Camco valves have dampeners constituting infringement on claims 4, 8 and 9; (2) as to the King system: (a) pressure differences, top to bottom, in the series valves are accomplished by differences in the sealed pressure charge in the bellows as specified in claims 10, 11 and 13; and as to some system applica-

tions, the valves sold are not similar to "Exhibit B" valves because (b) some Camco valves operate solely on the basis of a sealed pressure charged bellows and not in conjunction with a spring; and (c) some Camco valves are adapted for wire-line installation and retrieval in side pocket or other mandrels.[13] On ample evidence not challenged here, the District Court found that Camco did all of these things, but that each was within the grant of the license and hence did not constitute vicarious infringement.

The license agreement was itself the offspring of a serious and substantial controversy commencing in 1946. USI's predecessors (Olsco and Garrett) were contending at that time that their former sales representatives (Mills and Carlisle), the principal organizers of Camco, Inc., were infringing King 487. This followed the traditional pattern of threatened infringement suits and extended discussions looking toward a satisfactory disposition. All such negotiations were carried on by counsel between themselves. Out of that came a proposal for a license contract which, after passing through several drafts in the period from March to May 1947, resulted in the contract of June 4, 1947, with which we deal.[14]

11. These claims describe a valve having "a bellows charged and sealed with gas at a predetermined pressure" [Claim 3]. Of critical importance the protective seal is described as a "resilient means on said valve to seal off said bellows when the valve is open so as to prevent the application of an excessive pressure through said entry to said bellows" [Claim 3], or a "means for closing said opening upon a predetermined contraction of said bellows, whereby said bellows will be protected against excessive pressures on its exterior surface" [Claim 12].

12. These claims describe the valve as one having a bellows charged and sealed with gas at a predetermined pressure. The damper is described as "a damping baffle in said bellows" [Claim 4], "an enlarged reservoir forming a part of said bellows, and a damping baffle extending said reservoir into the bellows so as to reduce the volume of the bellows sub-

ject to pressure" [Claim 8] and "a damping baffle extending said reservoir into the bellow so as to reduce the volume of the bellows subject to pressure, and a leak port in said baffle to damp action of the bellows and valve member" [Claim 9].

13. The principal mandrel used, developed by Camco as a licensee, was the subject of Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, and U. S. Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1960, 277 F.2d 282.

14. The District Court held that the contract was unambiguous and required no parol evidence to aid in its construction. We agree. But induced by one or both of the parties to hear it, the Court received extensive testimony concerning the controversy, the negotiations, and the making of the contract, and held, alternatively, that this, too, led to a construction in favor of Camco. The evidence of negotiations included correspondence

The contract, in the whereas clause, described the controversy. It recited the charge that Camco was infringing 487 by "the manufacture and sale by Camco * * * of a valve illustrated in the print marked Exhibit 'A'." It also charged infringement because of the activities of Camco * * * in * * * causing to be set up and operated a certain system in wells employing said valves and also a similar system in wells employing valves of the type shown in the print marked Exhibit 'B'." It expressed their mutual desire "to settle and compromise their differences." Then followed its four principal undertakings. In Article I Camco, for the life of the license agreement, admitted the validity of 487 and that "the manufacture and sale of valves of the type shown in * * *. Exhibit 'A' " was an infringement. Article III was a release of Camco from all claims "because of past infringements by Camco * * * of the said King patent" 487. Article IV made the contract binding on the successors and assigns of each. As our dispute centers around Article II, the main clause, we set it out in full but with numbers in brackets inserted for ease of discussion:

"Olsco and Garrett hereby grant unto Camco, * * *, a fully paid up, non-exclusive, non-assignable right and license to [1] manufacture and [2] sell and [3] to use [4] in accordance with any system claim of the * * * King Patent [5] the valves shown in * * * Exhibit 'B' * *

and [6] any other similar valve [7] operated by pressure exerted on a bellows in which no seal is effected upon a predetermined distortion of the bellows from pressure acting upon the surface thereof for protecting the bellows against excessive distortion due to increases in pressure of the operating fluid beyond the pressure necessary to actuate the valve; [8] it being specifically understood and agreed that no license is granted for the manufacture, use or sale of valves of the type shown in Exhibit 'A' * * * nor [9] of any bellows actuated valve in which a seal is effected upon a predetermined distortion of the bellows whereby the bellows is protected against excessive pressure acting upon the surface thereof due to increases in pressure of the valve operating fluid beyond the pressure necessary to actuate the valve, [10] and it being further understood and agreed that no license is granted for the manufacture, use or sale of any improvement in valves [11] which has been or may be made or acquired by Olsco and Garrett or either of them. [12] The license herein granted shall be for the life of the aforesaid King Patent No. 2,339,-487, provided, however, [13] that in the event that by a decision of a Court of competent jurisdiction unappealed from Camco, Carlisle and Mills shall be held to have infringed the said King Patent after the exe-

to and from both counsel. We need not determine whether we would agree with the Court's alternative holding nor do we detail the evidence here. It is appropriate to point out, however, that much of the evidence was clearly proper, regardless of ambiguity, insofar as it portrayed the setting in which the contract was made as well as the origin of the now much disputed Exhibit B attached to it, Major Appliance Co. v. Hupp Corp., 5 Cir., 1958, 254 F.2d 503, 505; Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658, 662; REA Construction Co. v. B. B. McCormick & Sons, 5 Cir., 1958,

255 F.2d 257, 260; Petroleum Financial Corp. v. Cockburn, 5 Cir., 1957, 241 F. 2d 312, 317; Baker v. Nason, 5 Cir., 1956, 236 F.2d 483, 492; T. B. Walker Mfg. Co. v. Swift & Co., 5 Cir., 1912, 200 F. 529, 531, 43 L.R.A.,N.S., 730; Lockwood v. Ohio River Railway Co., 4 Cir., 1900, 103 F. 243, 245–246, quoted with approval in Stevens v. Galbeston, H. & S.A. Ry. Co., Tex.Com.App.1919, 212 S.W. 639, 642; James H. Craggs Construction Co. v. King, 5 Cir., 1960, 274 F.2d 1, 8; 3 Corbin, Contracts § 536 (1951); 9 Wigmore, Evidence § 2470 (1940).

cution of this agreement by the manufacture, use or sale of structures within the scope of said patent and outside the scope of the license herein granted, Olsco and Garrett may at their options thereupon terminate this license."

On USI's theory, the lettered notation on Exhibit B[15] is likewise of importance. It stated:

"Note: All valves in a setting have bellows charged to same pressure. Differential adjustment is made by adjusting the spring."

██ In the process of interpreting the contract, we are not much aided by the formalized rules applicable to Texas contracts.[16] But construing it as a whole, as we must, with the object of a reasonable, practical interpretation unless the terms prevent it, we agree with the District Court that Camco's actions are within the license. Our reasons will best appear and the discussion will be shortened by treating the problem against the specific charges of vicarious extra-license infringement.

### Infringement of Claims 10, 11, 13 Pressure Step-down Differences From Bellows Charge Only

It is undisputed that Camco has used bellows valves in a King system with the difference in pressure, top to bottom, being fixed by differences in the sealed pressure charge of each valve. It is USI's contention that, covered as it unquestionably is by claims 10, 11, 13, Camco has no right to use this method

---

15. The same notation appeared on Exhibit A. The drawings came into the picture initially as an enclosure in the letter of February 13, 1947, from Camco's counsel to Garrett's counsel. Also sent as an enclosure with the prints of Exhibit A and B was Camco's letter to its counsel. It stated that as of February 10, the plant would "provide a longitudinal groove in the stop member on our valves so that there can be no question as to whether a seal is formed * * *." It further stated "we are attaching * * drawings No. 107–4a dated 7–17–46 and No. 107–4a revised 2–11–47." These were shop prints bearing the legend "Camco Inc. Flow Valve Type FVA" drawn 7–17–46 "Patent Pending" (presumably by Camco). The print Exhibit B was identical with Exhibit A except for two things. Exhibit B had the notation at the bottom "Revised—2–11–47" and showed in the drawing the longitudinal groove in the stop member of the valve, together with the identifying legend "Pressure By-Pass Groove."

16. Both agree we must look to the instrument as a whole. Benge v. Scharbauer, 1953, 152 Tex. 447, 259 S.W.2d 166, 167; Woods v. Sims, 1954, 154 Tex. 59, 273 S.W.2d 617, 619; Hearne v. Gillett, 62 Tex. 23, 26; Storm v. United States, 5 Cir., 1957, 243 F.2d 708, 710.

There is a subsidiary controversy centering about the use or application of rules of construction of deeds applicable in Texas to other contracts. See Harris v. Windsor, 1956, 156 Tex. 324, 294 S.W.2d 798; 14-B Tex.Jur., Deeds §§ 124, 125. Camco urges the rule or canon that favors the granting clause at the expense of other clauses in the same instrument which contains repugnant or inconsistent language. It cites Waters v. Ellis, Tex.1958, 312 S.W.2d 231; Gibson v. Watson, Tex.Civ.App.1958, 315 S.W. 2d 48, 56, error dismissed; Camco also urges Garrett v. Dils Co., 1957, 157 Tex. 92, 299 S.W.2d 904 (which cites Harris v. Windsor, supra) and then states at page 906 of 299 S.W.2d that if there is any doubt "that doubt should be resolved against the grantors, whose language it is * * *."

USI rejoins that a provision will be deemed repugant only in the plainest case of necessity. It will not be treated as repugnant if it can be explained without destroying the grant in whole or in part. In support it cites Koenigheim v. Miles, 1886, 67 Tex. 113, 2 S.W. 81; Hansen v. Bacher, Tex.Com.App.1927, 299 S.W. 225; Associated Oil Co. v. Hart, Tex.Com.App.1925, 277 S.W. 1043; Mitchell v. Castellaw, 1952, 151 Tex. 56, 246 S.W.2d 163; Humpreys v. Skelly Oil Co., 5 Cir., 1936, 83 F.2d 989. USI also cites Reynolds v. McMan Oil & Gas Co., Tex.Com.App.1928, holdings approved by Sup.Ct., 11 S.W.2d 778, 781: "The relative positions of different parts of the instrument are not necessarily controlling; the modern and sounder reason being to ignore the technical distinctions between the various parts of the deed, and to seek the grantors intention from them all without undue preference to any * * *." Also Magnolia Petroleum Co. v. Connellee, Tex.Com.App. 1928, 11 S.W.2d 158, 159.

and hence infringes. Indispensable to this assertion is a literal application of the Note on Exhibit B as a restriction on authorized use. For the grant is a license to [1] manufacture and [2] sell and [3] to use [5]. "the valves shown in * * * Exhibit 'B' " [4] "in accordance with any system claim of the aforesaid King patent * * *." And the Exhibit "B" valve is, without a doubt, a sealed pressure charge bellows valve within the grant unless the Exhibit B Note[17] limits it.

But this Note, appearing on drawings A and B, is too equivocal to give it any such interpretation unless other factors compel that result. Without disparaging the final, written memorial of the agreement by parol evidence, either directly or in a left-hand fashion, it is an uncontradicted fact that these drawings were not prepared for this contract. They were reductions of drawings used for sales purposes. The note was on the drawings before they were put in Camco counsel's hands. The drawings with the accompanying memoranda, see note 15, supra, first entered the picture to describe a modification in design or manufacture in order to justify (quite apart from a settlement agreement) that this would remove the basis for alleged infringement as it eliminated the protective seal on the bellows. When the parties came to formalizing a compromise settlement thrashed out by months of negotiations, the drawings, bearing this Note, were a handy thing to describe and define the structure permitted and the structure prohibited. This is borne out by the fact that Exhibit "A" carried the same note. If it were meant as a limitation on the ultimate manner in which the valve was to be used in a King system, it was superfluous on Exhibit "A" drawing for the contract expressly prohibited such valves.[18]

Importing an engineering draftman's notation, dramatically demonstrated to be superfluous on a parallel drawing, would result in a substantial change in the broad words of the license. No longer would it be the grant of the right to manufacture, to sell, to use and to sell for use by others pressure charged valves of "the type shown in the print marked Exhibit B" [4] "in accordance with *any* system claim" of 487 (emphasis added). Instead clause [4] would then read "in accordance with any system claim *(except claims 10, 11 and 13)* of the * * * King patent."

We agree that the Note may not have any such limitation on the grant expressed in such sweeping terms.

### Infringement of System Claims By Valves Which Are

(A) Pressure Loaded Without Springs

(B) Adapted for Wire Line Retrievable Operations

While mechanically these two groups are different and require separate appraisal on similarity, they present substantially one problem on contract application. It is also important to keep in mind that while it is *valves* we talk about, the alleged extra-license infringement under this subdivision does not come about from infringement of valves claims.[19]

We think "similar" was meant to, and should, have a broad meaning as used in this contract. It is evident that these highly skilled patent solicitors, the able

---

17. The Note was: "Note: All valves in a setting have bellows charged to same pressure. Differential adjustment is made by adjusting the spring." See also note 15, supra.

18. See Clauses [7] and [8] of art. II of the contract.

19. See note 7. Indeed, it is not contended that such valves infringe any patent, and the contrary is plainly implied from USI's continued emphasis on the *un*patentable status of the Exhibit "B" valve. The asserted infringement is rather from the use of such valves in a King system because they are not [5] "the valves shown in the aforementioned Exhibit 'B' " nor are they [6] "any other similar valve [7] operated by pressure exerted on a bellows in which no seal is effected * * *."

votaries for these experienced litigators, purposefully chose a term far removed from their esoteric arsenal. They did not use the word "equivalent" which has its own settled unsettled meaning to the initiate. What they are trying to describe was a structure which did operate on the principle of a pressure charged bellows provided only that it did not encroach upon what Garrett thought to be the indispensable key to successful gas lift operation—the seal to protect the bellows against too violent an opening.

It was the nature of the valve—sealed pressure charged bellows type—which had at once precipitated the controversy and then became the standard of reference selected by the parties. Obviously they were not concerned with external appearance or physical characteristics apart from this. Any other construction simply makes no practical sense. At that late date, with a thriving and growing industry in gas lift operations marked by parallel agitation if not actual litigation testing, challenging, resisting, attacking this succession of devices, parties such as Camco knew of the vast improvements for retrievable valves. The considerations were not all running one way. Camco presumably had much to gain, but it had much to lose if it were to be held rigidly to a valve which merely *looked* like Exhibit "B". For by the settlement it lost the coercive power either to challenge or threaten to challenge validity or to gain the fruits of any such course through an even wider license at a subsequent date.

The contention is even weaker as to the use of pressure loaded bellows only. The structure portrayed in drawings A & B was a bellows pressure loaded valve which operated in conjunction with a metal spring. One function of the metal spring was to permit more ready field adjustments (generally within the limits of 100 (p.s.i.). The contention finally leads back to the Exhibit "B" Note theory, see note 17, supra. The reasoning runs somewhat like this. Since the Exhibit "B" special Note requires that pressure differential be achieved by adjusting the metal spring, there can be no adjustment unless there is a spring. Since the new type valve has no spring, it cannot be adjusted and is, therefore, unfit for use in a King system series requiring adjustment. From that the conclusion is reached that since a valve would be unusable, it is unthinkable that the parties contemplated that such a valve could be made or sold or used by Camco. The whole argument falls, of course, with the Exhibit "B" Note theory.

### Infringement of Valve Claims 4, 8, and 9

### Infringment by Use of Dampener Baffles

Thus far in assaying the particular devices claimed by USI to constitute extra-license infringement, our problem of construction has not required that we look upon the grant as anything more than a license for *system* claims. We have been able to assume that USI is correct that the right to [1] manufacture, the right to [2] sell, and the right [3] to use are all in conjunction with use [4] "in accordance with any system claim of the  *  *  *  King patent." In other words, the grant is for system claims only. So far, the problem has been merely to decide whether, in a system use, the valves are those [5] shown in Exhibit "B" or [6] similar pressure charged valves.

We must now face the question of valve claims.

There is no dispute that Camco has made and sold bellows type valves with dampener baffles. We accept the finding of the District Court that in the absence of the license, the dampeners would have constituted infringement of valve claims 4, 8 and 9.

The trial judge reasoned in this fashion. The license agreement grants to Camco a license to manufacture and sell the valves shown in Exhibit "B" and any other similar valves operated by pressure charged bellows. The license, of course, has usefulness only to the extent that it permits conduct which otherwise would be an infringement of *some* claim of the

patent. Valve claims are limited to 4, 8 and 9 in one group and 3 and 12 in the other.[20] Since 3 and 12 were admittedly and expressly excluded, the only valve claims remaining are 4, 8 and 9.

We arrive at the same conclusion though by a somewhat different process of contract interpretation. The analysis results, of course, in a basic conclusion that the grant is not, as USI contends, limited to *system* claims only.

The heart of USI's basic thesis is, of course, the assertion that the clause [4] "in accordance with any system claim of the * * * King patent" relates to and modifies all three rights which preceded in the sentence structure. Hence, it says, the right to [1] manufacture, the right to [2] sell the [5] Exhibit "B" or [6] similar [7] pressure operated valves is limited to the [3] use [4] "in accordance with any system claim * * *." But even if this were accepted it would not necessarily lead to a finding of vicarious infringement. For the evidence amply supports the trial court's conclusions, expressed or implied, that these accused valves were sold by Camco with the expectation and purpose that they would or might be used in a series system [4] "in accordance with any system claim." USI's thesis, therefore, requires a further step. That is, that since all the privileges under the license ( [1], [2], [3], [5], [6], [7] ) are tied to [4] which shows a major intention to cover *system* rights only, and as valves are not the immediate subject of the grant, the trial court's process of reasoning is inapplicable since it is in reality an effort to make an *assumed* grant of valve rights effectual.

Of course, the difficulty of any such process of mechanical analysis is that which unavoidably inheres in so much of judicial adjudication—at one step or another, whether lurking undisclosed or frankly recognized, one of the supporting reasons almost assumes the existence of the conclusion. For example, USI's thesis is virtually unanswerable if, but

the if is a big one, it is first decided that the grant is for system claims only. On the other hand, the analysis we follow seems impregnable once the interim decision is made that to [1] manufacture and to [2] sell, [5] valves means just what it says and was therefore intended to cover valves as well.

That requires the search for other factors which tend to give weight to one or the other of the two divergent subsidiary conclusions. We find them here largely in the extreme caution exercised in describing what kind of valves could *not* be manufactured. To put it another way, the grants seem clearly to say that Camco may manufacture any pressure charged bellows type valve so long as (a) it operates on the principle of the Exhibit "B" valve, (b) it does not have a seal to protect the bellows and (c) the differences (or changes) from Exhibit "B" valves are not the result of [10] "any improvement" which [11] "has been or may be made or acquired by Olsco and Garrett or either of them."

The prohibition that [8] "no license is granted for the manufacture, use or sale of * * * Exhibit 'A' " valves is also a significant factor. The rights are there stated disjunctively so that the right to manufacture, to sell, to use is not tied to use in a King system installation. Forbidding the disjunctive rights with respect to Exhibit "A" valves or those [9] with seal protected bellows permits the inference that it was intended that those same disjunctive rights would exist as to valves not within the prohibition. The similar prohibition that [10] "no license is granted for the manufacture, use or sale of any improvement in valves" has like significance. As with [8] the rights referred to are in the disjunctive. Moreover, the object is referred to as "any improvement in *valves*" which encompasses more than the Exhibit "B" type of valves. All of these things add up to the convincing impression that Camco, known by Garrett to be a formidable competitor, was expected

20. See notes 7, 11, and 12, supra.

vigorously to engage in the manufacture and sale of bellows type valves. This meant that to meet the demands of an expanding industry, Camco would make many changes and improvements. It was the nature of such improvements that they sought so clearly to restrict. Under no circumstances could they (1) provide a protective seal to the bellows or (2) be an improvement which the grantors had developed or might develop.

That leaves, then, only the narrow question whether the use of the dampener baffles described in claims 4, 8 and 9 were within the prohibited class of [10] "improvement in valves which [11] has been or may be acquired by Olsco and Garrett." Here the choice by these patent solicitor-attorney-negotiators of the term "improvement" is significant, especially in the light of their careful avoidance of a patent term of art in the use elsewhere of the word "similar." In the patent field it is certainly a comparative term and connotes some antecedent thing to be improved.[21] USI has to argue, however, that the phrase "has been or may be" refers to existing as well as to future improvements, and since the dampener baffles were an improvement over pre-existing structures (otherwise they would not have been patentable in claims 4, 8 and 9), it encompasses the improvements disclosed by King 487 as well as extraneous patents or developments. Of course, if this were acceptable, then the express prohibition against the manufacture of the Exhibit "A" type valve and the repeated prohibition against the manufacture of a valve with a seal protecting the bellows

would have been quite superfluous. That is so because without any question, the parties are in agreement that the patent does claim, and Garrett meant to deny to Camco, the novel improvement of a seal protecting the bellows. We need not seek to determine whether the term "improvement" had all of the connotations of the patent are and had to have, therefore, the essential characteristic of a patentable novelty over a pre-existing device. Whether so limited or not, it is clear that as used here it referred to changes, betterments, modifications, or adaptations thought to improve which were disclosed outside of King 487. This would comprehend structures or devices covered in other patents or by other practices. As to all such non-King 487 "improvements" the prohibition applied without regard to whether the grantors owned or acquired them in the past or future.

Finally, we agree also with Camco's contention that the interpretation followed here is corroborated here by the conduct of the parties and the practical interpretation they put upon it.[22] Not using laches as such, we can accept the Court's finding that USI for a number of years had knowledge that most of these practices now complained of were being carried on by Camco.[23] In the litigious atmosphere out of which this relation was born and the speed with which criticisms were made at other times, USI's silence was a powerful manifestation that USI considered that what Camco was doing was right. What the parties thought was right and was what the District Judge said was right.

21. See 1 Robinson, Patents 296.

"An improvement is an addition to or alteration in some existing means, which increases its efficiency without destroying its identity. It includes two necessary ideas: first, the idea of a complete and practically operative art or instrument, either natural or artificial, as the original to be improved; and second, the idea of some change in such art or instrument, not affecting its essential character, but enabling it to produce its appropriate results in a more perfect or a more economical manner."

22. Brooklyn Life Ins. Co. v. Dutcher, 1877, 95 U.S. 269, 273, 24 L.Ed. 410, 412; 3 Corbin, Contracts § 558 (1951).

23. USI had knowledge of four categories of structures asserted as infringing in this suit as early as 1949–1951; two others were known in 1954–1955. The earliest complaint by USI was in January-February 1956.

The result is that we approve the conclusion reached that there was no vicarious infringement and the acts of Camco were within the scope of the license.

Affirmed.